No. 2--08--0168     Filed: 2-24-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 07--CF--3558 |
| | ) ) | Honorable |
| DEJUAN T. DAVIS, a/k/a Torize Davis, | ) ) | Victoria A. Rossetti and Christopher R. Stride, |
| Defendant-Appellant. | ) | Judges, Presiding. |

PRESIDING JUSTICE ZENOFF delivered the opinion of the court:

On January 17, 2008, defendant, Dejuan T. Davis, also known as Torize Davis, was convicted of two counts of unlawful possession of a controlled substance with the intent to deliver (720 ILCS 570/401(a)(2)(A), (g) (West 2006)) and one count of unlawful possession of cannabis with the intent to deliver (720 ILCS 550/5(d) (West 2006)). He was sentenced to 11 and 5 years' imprisonment, respectively, on the two counts of unlawful possession of a controlled substance with the intent to deliver and 5 years' imprisonment on the count of unlawful possession of cannabis with the intent to deliver, all to run concurrently. Defendant appeals, arguing (1) that the trial court erred in denying his motion to suppress evidence and (2) that he is entitled to an additional day of credit for the time he spent in presentencing custody. For the reasons that follow, we reverse.

BACKGROUND

On October 10, 2007, defendant was indicted on two counts of unlawful possession of a controlled substance with the intent to deliver, one count of unlawful possession of cannabis with the intent to deliver, and one count of aggravated battery. As amended, count I alleged that defendant knowingly and unlawfully possessed, with the intent to deliver, more than 15 grams but less than 100 grams of a substance containing cocaine, in violation of section 401(a)(2)(A) of the Illinois Controlled Substances Act (720 ILCS 570/401(a)(2)(A) (West 2006)). As amended, count II alleged that defendant knowingly and unlawfully possessed, with the intent to deliver, a substance containing dextropropoxyphene, in violation of section 401(g) of the Illinois Controlled Substances Act (720 ILCS 570/401(g) (West 2006)). Count III alleged that defendant knowingly possessed, with the intent to deliver, more than 30 grams but less than 500 grams of a substance containing cannabis, in violation of section 5(d) of the Cannabis Control Act (720 ILCS 550/5(d) (West 2006)). Count IV alleged that defendant committed aggravated battery in that he knowingly caused bodily harm to Stephanie Harrison while on a public way, in violation of section 12--4(b)(8) of the Criminal Code of 1961 (720 ILCS 5/12--4(b)(8) (West 2006)).

Defendant filed a motion to suppress evidence on October 17, 2007, seeking to suppress all evidence and statements obtained as a result of the illegal entry into and search of defendant's apartment.

At the hearing on the motion to suppress, Deputy John Willer of the Lake County sheriff's office testified as follows. Early in the afternoon on September 16, 2007, Willer responded to a call to assist Deputy Forlenza regarding a traffic altercation in the area of Academy and Academy Court in Lake Villa, Illinois. Upon arrival, Willer spoke to Stephanie Harrison, who informed him that

while she was driving, Nicole Shatley, Shatley's boyfriend Geezie (defendant), and an unknown black male began to follow her in a car. Harrison told Willer that she owed Shatley and defendant money for drugs. Following a short chase, Harrison was cornered by the three and they began to attack her through the windows of her vehicle. According to Harrison, Shatley punched her in the head, while defendant and the other man punched her about her body.

Harrison described Shatley to Willer as a white female with blonde hair, who worked at a local gas station. She described defendant as a black male, but she did not know his real name. Harrison was able to describe the other man only as a young, black male in his early to mid-twenties. Willer knew Shatley and defendant, because he had often stopped, while on patrol, at the gas station where Shatley worked. Willer knew defendant to be the father of Shatley's child, and Willer had often seen defendant with Shatley at the gas station. Harrison also provided Willer with the location of Shatley's apartment in Antioch, Illinois. Harrison informed Willer that one could go to Shatley's apartment at any time of day or night to purchase any sort of illegal drug, including cocaine.

Willer, accompanied by some Antioch police officers and Lake County sheriff's deputies, proceeded to Shatley's apartment, which was located above a business. When he arrived, the windows of the apartment were open and, while standing on the sidewalk underneath one of the windows, he was able to hear two black males speaking to a female. Willer attempted to open the door to the stairs that led to the apartment, but the door was locked.

While Willer was speaking with the other officers, Shatley, accompanied by an older black female, exited through the locked door. The woman with Shatley was later identified as defendant's mother. Willer approached Shatley, explained he was there investigating a battery, and asked where defendant was. Shatley told Willer that he was upstairs in the apartment. Shatley was then put in

handcuffs, advised that she was being detained because she was under investigation for battery, and placed in the back of a squad car. Defendant's mother took out her cell phone to make a phone call, but Willer stopped her. Defendant's mother then became involved in an argument with Willer and the Antioch officers.

While defendant's mother continued to argue with the Antioch officers, Willer entered the staircase through the door, which an unknown individual had propped open with a newspaper, and proceeded upstairs to a common hallway shared by the two apartments located in the building. Shatley never told him that he did not have permission to enter the building or her apartment.

Willer testified that while standing in the hallway outside Shatley's apartment, he heard through the door a black male saying, "What, Nicole, police. I will be right there." The door to the apartment then opened and Willer saw defendant. Willer identified defendant as this man. When defendant saw Willer at the door, his eyes widened, his jaw dropped, and he immediately turned and attempted to run from Willer. Defendant was able to take about half a step before Willer stepped into the apartment, grabbed him, and handcuffed him. At the time he grabbed defendant, Willer was approximately four feet inside the threshold of the apartment. At the time Willer entered the apartment, neither Shatley nor defendant had given him permission to enter.

As Willer was handcuffing defendant, he observed another black male run to the right side of the apartment and into what was later discovered to be a bedroom. Willer heard a door close, but did not see exactly where the man ran. Willer also observed some children in the apartment and a woman in her mid-twenties to early thirties, later identified as Latonia Tyler, defendant's sister. Once defendant was handcuffed, Willer passed custody of defendant to another officer.

When he turned around, Willer was confronted by Tyler, who asked Willer what he was doing there, told him to get out, and attempted to physically push Willer out of the apartment. Willer then handcuffed Tyler, sat her on the couch, and, in search of the black male he had seen, proceeded to the only bedroom that had a closed door. Willer described the apartment as consisting of a kitchen, bathroom, living room, and two bedrooms. The bathroom was located right next to the front door, with the kitchen just beyond it. The living room was one large room to the right of the front door. Off of the living room were two bedrooms. Willer observed that the door to the master bedroom was open.

As he approached the closed bedroom door, Willer called for the man to come out but received no response. Willer then drew his weapon because he was unsure of what would happen when he opened the door. Willer opened the door and, as he walked in, noticed a black male, mostly covered by bedding, lying on the bottom bunk of a set of bunk beds. Willer handcuffed the man, and as he proceeded out of the bedroom, looked into the open master bedroom. Willer observed a digital scale with white powder on it on top of a dresser in the master bedroom.

After walking the man out of the apartment building, Willer went to speak to Shatley. Shatley was seated in the back of one of the squad cars. Willer read Shatley the Miranda warnings, told her that he had seen a scale with white powder in the master bedroom, and asked for her consent to search the apartment. Shatley consented to a search of the apartment.

During the search of the apartment, Willer located and seized a loaded 9-millimeter handgun with two extra magazines; the digital scale he originally observed; the white powder he originally observed, which field-tested positive for the presence of cocaine; approximately 100 grams of a brown rock-like substance, which field-tested positive for the presence of cocaine; cannabis; a pill

bottle with approximately 59 pills, which field-tested positive for hydrocortisone; and a pill bottle containing about 85 to 87 prescription pills.

During Willer's testimony, a video recording of the conversation between Willer and Shatley, during which Shatley consented to the search of the apartment, was played. Upon entering the squad car, Willer read Shatley the <u>Miranda</u> warnings, which she indicated she understood. He then informed her that he had observed a scale with cocaine on it and that he would try to get a search warrant for her apartment based upon what he had seen and what Harrison had told him occurred in the apartment. Willer informed Shatley that unless she explained to him what was in the apartment, she would be charged with anything he found pursuant to a search warrant. Willer then asked Shatley for consent to search her apartment and to seize anything illegal in it. In return for her consent, Willer promised not to charge or take her to jail that night. When Shatley indicated her concern about being charged in the future, Willer told her that he could not promise that she would or would not be charged in the future, but that someone needed to care for the children in the apartment (later identified as Tyler's children). At one point during the conversation, an unidentified male (who did not appear on screen) told Shatley that there was an easy way and a hard way, and that the hard way involved calling the Department of Children and Family Services (DCFS) for the children in the apartment. After Willer assured Shatley that Tyler would be released later that evening, Shatley consented to the search of the apartment.

Shatley testified as follows. Defendant was her boyfriend and the father of her child. He lived with her in the apartment in Antioch, although only her name appeared on the lease. On September 16, 2007, Shatley, defendant's mother, and Tyler's son exited Shatley's apartment building to go grocery shopping. After exiting the building, Shatley saw three police officers, including

Willer, whom she recognized from the gas station where she worked. Willer grabbed her, handcuffed her, and asked where her apartment was and where defendant was. Shatley did not respond to Willer's questions. Willer walked Shatley toward the door of her apartment building until he noticed that the door was not shut all the way. At that point, Willer pushed open the door and proceeded up the stairs, leaving Shatley outside. As he did so, Shatley told him that he could not go into her apartment.

Shatley was left at the bottom of the stairs, from which she could see the door to her apartment open and defendant step into the hallway. The officer who was with Shatley ran up the stairs at that point, leaving Shatley completely alone outside. Shatley observed the officers handcuff defendant and heard defendant yell at the officers that they could not go into the apartment. Defendant yelled Shatley's name and Shatley yelled again that the officers could not go into her apartment. Defendant was then brought down the stairs, and Shatley was placed in a squad car.

After approximately 10 to 15 minutes, Willer came to the police car and requested Shatley's consent to search the apartment. Willer told her that he had found a scale with a white substance on the dresser and that he would get a warrant if she did not give him permission to search the apartment. He also told her that everyone was being arrested and that he was going to call DCFS to take Tyler's children. In addition, Willer informed her that if she gave him consent to search the apartment, he would not charge her that day and would not call DCFS. Shatley then gave him permission to search the apartment. She was never charged in the matter.

Tyler's testimony was as follows. She was defendant's sister. On September 16, 2007, she and two of her children were at defendant's apartment, which he shared with Shatley. In the apartment on that day were Tyler, Shatley, defendant, Tyler's two children, Tyler's and defendant's

mother, and Tyler's cousin Edward Davis.[1] Defendant received a phone call from their mother, after which defendant informed Tyler that the police were there. Defendant and Tyler went to the door of the apartment. Tyler opened the apartment door and standing right outside the door was a police officer. Defendant stepped outside the apartment, and the officer then grabbed defendant, threw him against the wall, threw him onto the floor, and then put handcuffs on him. Defendant was outside the apartment in the hallway at this point.

After being handcuffed, defendant told Tyler to shut the door, which Tyler attempted to do, but she was prevented from shutting the door completely when the officer put his foot in the door and told her not to close it. Tyler told the officer that he did not have permission to enter. The officer asked Tyler who was present in the apartment and Tyler responded that she and her children were present. The officer told Tyler to go sit down, but then grabbed her arm, pushed her into the wall, and entered the apartment. Tyler informed the officer that she was going to press charges against him, at which point the officer placed her under arrest for pushing him.

Edward Davis was in a bedroom when the police came to the door, and he did not leave the bedroom at any point while defendant was being arrested.

Deantrius Colman, Tyler's son, who was 10 years old at the time of the hearing, testified as follows. On September 16, 2007, he was in the living room of Shatley and defendant's apartment, playing a game. When the police arrived, defendant opened the apartment door. Tyler was sitting on the couch when defendant opened the door. At some point, Tyler attempted to shut the door, but the police officer put his foot in the door, grabbed Tyler's arm, pushed Tyler, and then placed her in

---

[1]At times in the record, Edward Davis is also referred to as Edward Jones.

handcuffs. Edward Davis was in a bedroom when the police arrived and did not leave the bedroom until he was taken out by police.

Dazyir Colman, Tyler's daughter, who was eight years old at the time of the hearing, testified next. On September 16, 2007, she was at defendant's apartment when the police came to the door. Tyler opened the door. The police grabbed defendant and put him in handcuffs while he was in the hallway, after which the police entered the apartment, pushed Tyler into the wall, and placed Tyler under arrest. Edward Davis was sleeping in a bedroom with the door closed at the time he was placed under arrest.

Following arguments, the trial court denied defendant's motion to suppress, finding that neither Shatley nor defendant told Willer that he could not enter the apartment and that once defendant, Shatley, and Tyler were placed in custody, it was necessary for the officers to enter the apartment because the children could not be left alone with the unknown person Willer had seen run across the apartment. In addition, the trial court noted that Willer had information that drugs were being dealt from the apartment. The trial court found Shatley's consent to have been given voluntarily and that Shatley would have given consent based solely on the drug-dealing information the police obtained from Harrison, thus making applicable the inevitable-discovery doctrine.

Prior to trial, the State nol-prossed count IV (aggravated battery).

At trial, Deputy John Forlenza of the Lake County sheriff's office testified that he was present at the scene of the incident involving Harrison and when Willer searched defendant's apartment. Sarah Effinger, a forensic scientist with the Northeastern Illinois Regional Crime Laboratory, testified that the substances seized during the search of defendant's apartment tested positive for cocaine, cannabis, and dextropropoxyphene.

Willer also testified at trial. His testimony was largely consistent with the testimony he gave during the hearing on the motion to suppress. He further testified that following his search of defendant's apartment, he explained to defendant all of the items he had recovered and asked defendant who owned those items. He testified that defendant stated that all of the items, with the exception of the gun, belonged to him (defendant). Willer also testified that after transporting defendant to the sheriff's office, defendant gave the following written statement:

"To whom it may concern[:] My name is Torize Davis and I'm writing this statement to inform you the controled [sic] substance found in the room dresser was mine also the canibus [sic] found in the kitchen & in the bedroom drawer. The owner of the gun is Nichole [sic] Shatley & she has her foild [sic] card. I touched the gun on different occasion[s]. The gun was bought at Bass Pro Shop. The 2 bottles of Vilodin [sic] pills in the kitchen drawer are mine also."

Following the jury trial, defendant was convicted on the three remaining counts. The trial court denied defendant's motion for a new trial and sentenced defendant to 11 years' imprisonment on count I, 5 years' imprisonment on count II, and 5 years' imprisonment on count III, all to run concurrently. The trial court denied defendant's motion to reconsider the sentence, and defendant appealed.[2]

## ANALYSIS

---

[2]This appeal was previously dismissed for lack of jurisdiction, but on May 7, 2009, the Illinois Supreme Court ordered that the appeal be reinstated and defendant's notice of appeal be treated as validly filed.

Defendant first argues that the trial court erred in denying his motion to suppress. According to defendant, Willer's entry into the apartment to arrest defendant was illegal because the entry was warrantless, nonconsensual, and not justified by exigent circumstances. Defendant further contends that Shatley's consent to search the apartment was involuntary because Willer promised not to take Shatley to jail that evening if she consented and because Willer confronted Shatley with the scale and white powder he had seen following his unlawful entry into the apartment. Defendant argues that because Shatley's consent was involuntary, the evidence found during the search pursuant to Shatley's consent and the statements defendant made after being confronted with that evidence should have been suppressed. The State responds that Willer's entry into the apartment was justified because Willer was in "hot pursuit" of defendant, that Shatley's consent was voluntary, and that, thus, the trial court correctly refused to suppress defendant's statements and the evidence seized during the search of the apartment. The State also argues that even if Shatley's consent was involuntary, the evidence located during the search inevitably would have been discovered. We agree with defendant's analysis.

In reviewing the trial court's determination on a motion to suppress, we will reverse the trial court's determinations of historical fact only if they are against the manifest weight of the evidence. People v. Pitman, 211 Ill. 2d 502, 512 (2004). We remain free, however, to independently assess the facts in relation to the issues presented and to draw our own conclusions as to what relief should be granted; thus, we review de novo the ultimate question of whether the evidence should be suppressed. Pitman, 211 Ill. 2d at 512.

We first examine whether Willer's entry into defendant's apartment was lawful. The chief evil against which the fourth amendment to the United States Constitution is directed is the physical

entry of the home. Payton v. New York, 445 U.S. 573, 585, 63 L. Ed. 2d 639, 650, 100 S. Ct. 1371, 1379 (1980); People v. Wear, 229 Ill. 2d 545, 562 (2008). Thus, the fourth amendment "has drawn a firm line at the entrance to the house" (Payton, 445 U.S. at 590, 63 L. Ed. 2d at 653, 100 S. Ct. at 1382), and warrantless searches and seizures inside a home are presumptively unreasonable (Payton, 445 U.S. at 586, 63 L. Ed. 2d at 651, 100 S. Ct. at 1380; Wear, 229 Ill. 2d at 562). Accordingly, absent exigent circumstances, police may not enter a private residence to make a warrantless search or arrest. Payton, 445 U.S. at 590, 63 L. Ed. 2d at 653, 100 S. Ct. at 1382; People v. Foskey, 136 Ill. 2d 66, 74 (1990). The State bears the burden of demonstrating exigent circumstances necessitating a warrantless search or arrest. Foskey, 136 Ill. 2d at 75.

In reviewing the propriety of a warrantless entry into a private residence under claimed exigent circumstances, the guiding principle is reasonableness, and each case must be decided on its own facts. Foskey, 136 Ill. 2d at 75-76. Some of the factors that may be considered in determining whether exigent circumstances existed justifying the warrantless entry into a private residence to effectuate an arrest include the following:

"(1) whether the offense under investigation was recently committed; (2) whether there was any deliberate or unjustifiable delay by the officers during which time a warrant could have been obtained; (3) whether a grave offense is involved, particularly one of violence; (4) whether the suspect was reasonably believed to be armed; (5) whether the police officers were acting upon a clear showing of probable cause; (6) whether there was a likelihood that the suspect would have escaped if not swiftly apprehended; (7) whether there was strong reason to believe that the suspect was on the premises; and (8) whether the police entry, though nonconsensual, was made peaceably." Foskey, 136 Ill. 2d at 75.

This list is not exhaustive, nor are the factors included in it cardinal maxims that are to be applied rigidly in each case. People v. Johnson, 368 Ill. App. 3d 1073, 1084 (2006). Rather, the totality of the circumstances facing the officers at the time of the entry must be considered and, based on those circumstances, it must be determined whether the officers acted reasonably. Foskey, 136 Ill. 2d at 75. "The circumstances must militate against delay and justify the officers' decision to proceed without a warrant." Foskey, 136 Ill. 2d at 75.

In this case, it is undisputed that Willer had neither a warrant nor consent to enter the apartment. Our review of the record reveals that there did not exist exigent circumstances to justify Willer's entry into the apartment to arrest defendant for the battery committed against Harrison. The evidence presented by the State at the hearing on the motion to suppress does not support a finding of exigent circumstances because it does not suggest an immediacy or real threat of current danger or likelihood of flight. See Foskey, 136 Ill. 2d at 84 (reversing the trial court's determination that exigent circumstances justified the warrantless arrest of the defendant in the defendant's home where "the facts known to the police at the time they arrested the defendant certainly did not suggest the immediacy and real threat of current danger or likelihood of flight that was present in other cases where warrantless searches have been held valid"). Nor do the circumstances of this case indicate that the delay involved in obtaining an arrest warrant for defendant would have impeded the investigation or the apprehension of defendant. See People v. Klimek, 101 Ill. App. 3d 1, 6-7 (1981) (concluding that the warrantless entry was unjustified, in part because the delay involved in obtaining a warrant would not have impeded the investigation or prevented the apprehension of the defendant); People v. Wilson, 86 Ill. App. 3d 637, 643 (1980) (determining that no exigent circumstances existed to justify the warrantless arrest of the defendant in his hotel room where there was no indication that

the delay associated with obtaining a warrant would have impeded the apprehension of the defendant).

The offense for which Willer sought to arrest defendant--the battery of Harrison--certainly involved a form of violence in that defendant allegedly punched Harrison. Nothing in the record indicates, however, that this offense was particularly grave; there was no evidence that as a result of the alleged battery Harrison suffered any sort of injury, sought medical treatment, or was in any way hindered in performing her normal activities. In addition, the police had no reason to believe that defendant was armed or otherwise posed a threat to the police or others; no evidence was presented that the police suspected defendant was armed, that a weapon was involved in the battery of Harrison, or that the police knew whether defendant had a particularly violent history. Moreover, no evidence was presented indicating that defendant was likely to flee unless he was swiftly apprehended. The State presented no evidence that defendant knew or was likely to be aware that Harrison had called the police and that the police were on the way to his apartment. See Foskey, 136 Ill. 2d at 79-80 (the defendant did not pose a flight risk where there was no evidence that the defendant or any of the other suspects knew or were aware that they were in immediate danger of being arrested); People v. Galdine, 212 Ill. App. 3d 472, 483 (1991) (where there was no evidence that the defendant was aware the drug buyer was an informant or that his suspicions were aroused by the buyer's departure from the scene of the drug deal, the defendant did not pose a flight risk); People v. Day, 165 Ill. App. 3d 266, 268 (1988) (where the defendant was unaware of the police activity, his immediate apprehension was not necessary to prevent his flight).

While it is true that defendant's arrest occurred in close temporal proximity to the battery of Harrison, that the police did not engage in any unjustifiable delay, that the police had probable cause

to arrest defendant, that the police had reason to believe defendant was in the apartment, and that the police entered the apartment peaceably, we are not persuaded that these circumstances, without more, necessitated prompt action by the police in the form of a warrantless entry and arrest. That the police acted quickly in locating defendant and had probable cause to arrest him did not obviate the need to obtain a warrant where there was no immediate and clear danger to the police or others. See Galdine, 212 Ill. App. 3d at 483 (observing that an exigency is not created simply because there exists probable cause to believe the defendant committed a serious crime and holding that exigent circumstances did not exist where there was no immediate danger to the police or to the informant and where the defendant was not a flight risk); Klimek, 101 Ill. App. 3d at 6 (emphasizing that "the mere fact that the officers did not hesitate between the time of the complaint and their forcible entry does not render void the necessity of obtaining a warrant" and holding that exigent circumstances did not exist because "a delay in obtaining a warrant would not have jeopardized the apprehension of the defendant or hindered any police investigation").

This case is similar to Day. There, the defendant sought to suppress evidence discovered following a warrantless entry into his apartment by the police, but the trial court denied the defendant's motion to suppress. Day, 165 Ill. App. 3d at 267. The Fourth District reversed, holding that exigent circumstances did not exist to justify the warrantless entry into the defendant's apartment. Day, 165 Ill. App. 3d at 268. The factors that weighed in the State's favor, in addition to an informant's identification of the defendant as the offender, were that the officers acted quickly and without unjustifiable delay, there was good reason to believe the defendant was on the premises, and the officers entered peaceably. Day, 165 Ill. App. 3d at 268-69. The Fourth District observed,

however, that "[t]o hold these factors alone sufficient to justify a warrantless entry and arrest would all but emasculate the protection afforded by the fourth amendment." Day, 165 Ill. App. 3d at 269.

Similarly, were we to hold that exigent circumstances existed justifying the warrantless entry and arrest in the present case, police could avoid the warrant requirement of the fourth amendment so long as they quickly and accurately tracked a defendant to a private residence and entered in a peaceful manner. To do so would all but eliminate the exigent-circumstances requirement that Payton imposed upon warrantless arrests.

The State contends that Willer's entry into defendant's apartment was justified under the doctrine of "hot pursuit." In addition to the exigent-circumstances exception to the warrant requirement of the fourth amendment discussed above, police also may enter a private residence without a warrant to effectuate the arrest of a fleeing suspect of whom the police are in "hot pursuit." United States v. Santana, 427 U.S. 38, 42-43, 49 L. Ed. 2d 300, 305, 96 S. Ct. 2406, 2409-10 (1976); Wear, 229 Ill. 2d at 563. Under the hot-pursuit doctrine, "a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper under [United States v. Watson, 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820 (1976)], by the expedient of escaping to a private place." Santana, 427 U.S. at 43, 49 L. Ed. 2d at 306, 96 S. Ct. at 2410.

In Santana, the police, who had probable cause to arrest the defendant, proceeded to the defendant's house, where they found the defendant standing in the doorway. Santana, 427 U.S. at 40, 49 L. Ed. 2d at 304, 96 S. Ct. at 2408. According to the testimony of one of the officers, the defendant "was standing directly in the doorway--one step forward would have put her outside, one step backward would have put her in the vestibule of her residence." Santana, 427 U.S. at 40 n.1, 49 L. Ed. 2d at 304 n.1, 96 S. Ct. at 2408 n.1. Upon arriving, the police identified themselves, and

the defendant then retreated into her house. The police followed her into the house, capturing her in the vestibule and placing her under arrest. Santana, 427 U.S. at 40, 49 L. Ed. 2d at 304, 96 S. Ct. at 2408.

The Supreme Court noted that under Watson, where probable cause exists, police may effectuate a warrantless arrest on a person in public without violating the fourth amendment. Santana, 427 U.S. at 42, 49 L. Ed. 2d at 305, 96 S. Ct. at 2409. The Court also observed that when the police initially attempted to arrest the defendant, she was standing in the doorway of her house, neither inside nor outside the house. Santana, 427 U.S. at 42, 49 L. Ed. 2d at 305, 96 S. Ct. at 2409. The Court concluded that the defendant was in public for purposes of the fourth amendment, because she "was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." Santana, 427 U.S. at 42, 49 L. Ed. 2d at 305, 96 S. Ct. at 2409. Thus, the officers, at the time they initiated the arrest of the defendant, sought to effectuate an arrest in accordance with the procedures approved in Watson, and the Court held that the defendant could not thwart that lawful arrest by retreating into her private residence. Santana, 427 U.S. at 42, 49 L. Ed. 2d at 305, 96 S. Ct. at 2409.

The doctrine of hot pursuit is inapplicable here, as defendant was never in public. Willer's testimony, which the trial court apparently credited, indicates that once the door to the apartment opened, defendant did not step outside the apartment and into the hallway. Rather, Willer's testimony indicates that immediately upon the door opening and defendant's seeing Willer in the hallway, defendant attempted to retreat further into the apartment.[3] The fact that the warrantless

---

[3]Even if defendant had been standing in the doorway of his apartment rather than inside it, the present case would be significantly distinguishable from Santana, as defendant's apartment door

arrest of defendant was initiated while defendant was inside his apartment rather than in public is significant because the hot-pursuit doctrine as defined in <u>Santana</u> is based on the determination that a defendant should not be able to "thwart an <u>otherwise</u> <u>proper</u> arrest" (emphasis added) (<u>Santana</u>, 427 U.S. at 42, 49 L. Ed. 2d at 305, 96 S. Ct. at 2409) by retreating into a private residence. Warrantless arrests based on only probable cause and instituted while the defendant is in public are "otherwise proper" under <u>Watson</u>. In contrast, warrantless arrests based on only probable cause and instituted while the defendant is in his or her private residence are not "otherwise proper." See <u>Payton</u>, 445 U.S. at 590, 63 L. Ed. 2d at 653, 100 S. Ct. at 1382. Thus, defendant's attempted retreat to the back of the apartment did not thwart an "otherwise proper arrest," because the arrest of defendant would not have been proper at the time it was initiated, given that defendant was inside the apartment at that time.

The State fails to address the fact that defendant was never in public and the impact of that fact upon the application of the hot-pursuit doctrine. Rather, the State focuses on the fact that Willer had probable cause to arrest defendant. Whether Willer had probable cause is irrelevant in the present case, because, as discussed, defendant did not thwart an "otherwise proper arrest" by retreating further into the apartment; probable cause alone was insufficient to make a proper warrantless arrest of defendant while he was inside his private residence.

---

opened into a hallway that was accessible only to the residents and landlord of the two apartments in the building and that was not open to the public. Thus, unlike the defendant in <u>Santana</u>, if defendant stood directly in the doorway of his apartment, he would not be exposed to public view, speech, hearing, and touch as he would be if he were outside.

Having determined that Willer's entry into defendant's apartment to effectuate the warrantless arrest of defendant was unlawful, we must now determine what effect that unlawful entry had upon Willer's discovery of the scale and white powder in the master bedroom. While the scale and white powder were readily visible to Willer as he exited the apartment with the unidentified male who was in the other bedroom, that fact alone is not determinative of whether Willer was legally entitled to seize those items. Under the plain-view doctrine, an officer may legally seize an item without a warrant where (1) the officer did not violate the fourth amendment in arriving at the place from which the item is plainly viewed, (2) the item is in plain view and its incriminating nature is immediately apparent, and (3) the officer has a lawful right of access to the object itself. Horton v. California, 496 U.S. 128, 136-37, 110 L. Ed. 2d 112, 123, 110 S. Ct. 2301, 2308 (1990). The question in the present case is whether Willer was lawfully in the place from which he viewed the scale and white powder. The State argues that he was, because he was entitled to conduct a protective sweep of the apartment when he saw the unidentified male running into a bedroom while Willer was handcuffing defendant. We disagree.

A protective sweep is a "quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers and others," and is limited to a cursory visual inspection of places in which a person may hide. Maryland v. Buie, 494 U.S. 325, 327, 108 L. Ed. 2d 276, 281, 110 S. Ct. 1093, 1094 (1990). Such a sweep may be conducted, however, only where the "searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Buie, 494 U.S. at 337, 108 L. Ed. 2d at 288, 110 S. Ct. at 1099-1100.

We conclude that in this case, the "protective sweep" Willer conducted may not serve as legal justification for Willer's presence in the place from which he viewed the scale and white powder, because Willer's initial entry into defendant's apartment was unlawful. Although no Illinois court has directly addressed whether evidence is legally observed or seized when it is discovered during a protective sweep conducted following an illegal entry by police, the Fourth District, in People v. Bosse, 238 Ill. App. 3d 1008 (1992), implicitly held that a protective sweep may not independently justify the observation of evidence in plain view where the initial entry was unlawful. In Bosse, police officers proceeded to the defendant's apartment after the defendant had fled from an officer. The defendant answered the door when the police knocked and, upon one of the officers' request to enter the apartment, the defendant stepped back. The police then entered. After securing the defendant, an officer conducted a protective sweep of the apartment, during which he observed in plain view a plastic bag that appeared to contain cannabis and a "bong" containing cannabis. The officer then placed the defendant under arrest for possession of cannabis and informed the defendant that a search warrant would be obtained and a dog used to search the apartment. The defendant then gave the officer consent to search the apartment. During the subsequent search, the police discovered additional cannabis and drug paraphernalia. Bosse, 238 Ill. App. 3d at 1010-12. The trial court granted the defendant's motion to suppress the evidence discovered in the defendant's apartment. Bosse, 238 Ill. App. 3d at 1009.

On appeal, the State argued that the order granting the motion to suppress should be reversed because (1) the defendant consented to the entry of his apartment by the police, and (2) the police conducted a lawful protective sweep of the defendant's apartment. Bosse, 238 Ill. App. 3d at 1016. The Fourth District held that it was not required to address the legality of the protective sweep

because it affirmed the trial court's finding that the police did not have consent to make their initial warrantless entry into the defendant's apartment and the State offered no other justification for the officers' entry. Bosse, 238 Ill. App. 3d at 1016. By so holding, the Fourth District implied that where the initial entry into a defendant's residence is unlawful, a protective sweep may not serve as legal justification for the discovery of evidence in plain view.

In addition to Bosse, several other states and federal circuits require police to enter the premises lawfully before the protective-sweep doctrine may be invoked. See United States v. Martins, 413 F.3d 139, 150 (1st Cir. 2005) ("We hold, therefore, that police who have lawfully entered a residence possess the same right to conduct a protective sweep whether an arrest warrant, a search warrant, or the existence of exigent circumstances prompts their entry" (emphasis added)); United States v. Gould, 364 F.3d 578, 587 (5th Cir. 2004) (requiring that "the police must not have entered (or remained in) the home illegally and their presence within it must be for a legitimate law enforcement purpose"); United States v. Patrick, 959 F.2d 991, 996 (D.C. Cir. 1992) ("Once the police were lawfully on the premises, they were authorized to conduct a protective sweep based on their reasonable belief that one of its inhabitants was trafficking in narcotics" (emphasis added)); State v. Stover, No. COA09-229, slip op. at 15 (N.C. App. November 3, 2009) ("Because the officers legally entered defendant's house and saw the evidence seized in plain view during their protective sweep, the trial court did not err in admitting that evidence"); State v. Lane, 393 N.J. Super. 132, 155, 922 A.2d 828, 841 (2007) ("Fundamental to determining the legitimacy of a protective sweep is the notion that the police may not illegally enter or remain in the area in which the sweep is performed"); People v. Beuschlein, 245 Mich. App. 744, 757, 630 N.W.2d 921, 929 (2001) ("Having already established the legality of the officers' entry without a warrant into defendant's mobile home,

-21-

the ensuing protective sweep of the premises, after defendant was handcuffed, was likewise permissible").

We also observe that in every published Illinois case upholding a protective sweep, the officers' presence on the premises was lawful. See, e.g., People v. Free, 94 Ill. 2d 378, 392 (1983) (officers at defendant's home pursuant to an arrest warrant); People v. Harris, 297 Ill. App. 3d 1073, 1083 (1998) (warrantless entry justified by exigent circumstances); People v. Pierini, 278 Ill. App. 3d 974, 979 (1996) (warrantless entry justified by exigent circumstances); People v. Coleman, 194 Ill. App. 3d 336, 341 (1990) (lawful entry of residence pursuant to arrest warrant).

Further, we believe that to allow a protective sweep to legitimize the discovery of evidence in plain view where the initial entry was unlawful would be to legitimize the discovery of the evidence on circumstances directly attributable to the officers' illegal entry. For example, in the present case, the protective sweep conducted by Willer was necessitated solely by the officers' illegal entry into defendant's apartment, because Willer and the other officers were exposed to the danger posed by the unidentified male only because they illegally entered defendant's apartment. Had Willer seen the scale and white powder following the illegal entry but not during a protective sweep, such evidence would not have been admissible under the plain-view doctrine, as Willer legally would not have been in the place from which he viewed the items. See Klimek, 101 Ill. App. 3d at 6 (where warrantless entry was not justified by exigent circumstances, plain-view doctrine did not apply). Thus, were we to hold that the scale and white powder were legally discovered during Willer's protective sweep, which was made necessary exclusively due to the officers' earlier illegal entry, law enforcement could circumvent fourth amendment restrictions on the use of evidence following illegal entries into private residences, so long as the circumstances existing inside the residence into which

the officers chose to illegally enter posed a sufficient danger to the officers' safety. We believe such a result to be absurd and out of line with fourth amendment jurisprudence requiring the exclusion of evidence obtained either directly or indirectly as a result of unlawful police activity. See Wong Sun v. United States, 371 U.S. 471, 484-85, 9 L. Ed. 2d 441, 453-54, 83 S. Ct. 407, 416 (1963).

As Willer was not legally entitled to conduct a protective sweep because he was not lawfully on the premises, he was not legally present in the place from which he viewed the scale and white powder. Therefore, the plain-view doctrine does not apply, making Willer's discovery of the scale and white powder illegal. See Klimek, 101 Ill. App. 3d at 6 (where officer not lawfully within the residence, the plain-view doctrine did not apply).

Given our conclusion that Willer's discovery of the scale and white powder was unlawful, the question becomes whether Willer's use of that evidence in obtaining Shatley's consent to search the apartment had the effect of vitiating the voluntariness of Shatley's consent. We conclude that it did. Voluntary consent to search is an exception to the fourth amendment's warrant requirement. People v. Kratovil, 351 Ill. App. 3d 1023, 1030 (2004). To be effective, however, the consent must be voluntary, meaning that it was given "absent any coercion, express or implied," and was not "the result of official coercion, intimidation, or deception." Kratovil, 351 Ill. App. 3d at 1030. The voluntariness of consent depends on the totality of the circumstances, and the State bears the burden of demonstrating that consent was voluntarily given. Kratovil, 351 Ill. App. 3d at 1030.

Where an officer communicates his intent to engage in a certain course of conduct, that communication does not vitiate a person's consent to search, so long as the officer has actual grounds for carrying out the intended course of conduct. Kratovil, 351 Ill. App. 3d at 1031; see also People v. Graf, 265 Ill. App. 3d 746, 750-51 (1994) ("a police officer making a groundless threat and

presenting the occupant with the choice of either consenting or suffering the consequences of the threatened course of conduct can serve to vitiate that person's consent"); People v. Griffin, 158 Ill. App. 3d 46, 52 (1987) (where the officer had no grounds to obtain a search warrant other than the items seen following the officer's illegal entry, the threat of obtaining a search warrant could not lawfully be employed). An officer's giving of false or misleading information can also vitiate the voluntariness of the consent. People v. Cardenas, 237 Ill. App. 3d 584, 588 (1992). Consent is involuntary where it is solely the result of acquiescence or submission to the assertion of lawful police authority. Cardenas, 237 Ill. App. 3d at 588; see also People v. Clark Memorial Home, 114 Ill. App. 2d 249, 253-54 (1969) (consent involuntary where the officers illegally entered the premises, viewed illegal gambling equipment due to the illegal entry, and told the consenting party that the police had been informed of additional gambling equipment). Consent is also involuntary where it is " 'inextricably bound up with illegal conduct and cannot be segregated therefrom.' " People v. Freeman, 121 Ill. App. 3d 1023, 1032 (1984), quoting People v. Kelly, 76 Ill. App. 3d 80, 86 (1979); see also People v. Gott, 346 Ill. App. 3d 236, 248 (2004) (consent involuntary where it was inextricably bound up with the illegal entry by the officers); Griffin, 158 Ill. App. 3d at 52 (consent involuntary where the police exploited the prior illegal search).

After reviewing the record, specifically the video recording of the conversation in which Willer elicited Shatley's consent to search the apartment, we conclude that the trial court's finding that Shatley's consent was voluntary was erroneous because Willer's illegal entry and resulting illegal discovery of the scale and white powder were so "inextricably bound up" with Shatley's consent that they cannot be segregated, and because Willer's groundless threat to obtain a search warrant resulted in Shatley's consent being solely a product of Willer's assertion of lawful authority. Immediately

after giving Shatley the <u>Miranda</u> warnings, Willer confronted her with his discovery of the scale and white powder. He then threatened that, unless Shatley consented to a search, he would obtain a search warrant using the scale and powder, along with Harrison's statement that drugs were sold from the apartment, and that he would charge Shatley with everything he "kn[e]w" he would find in the apartment. Specifically, Willer told Shatley, "If I get a search warrant and I go through [the apartment], you're going down with it." Throughout the conversation, Willer repeatedly used his knowledge of the scale and white powder to convince Shatley to consent, telling her numerous times that he knew there was additional contraband in the apartment; that she was the one who allowed the scale, powder, and other contraband into the apartment; that as the lessee of the apartment, she would be "going down" for everything he knew he would find in the apartment; and that the only way she could fix her mistake of allowing the contraband into the apartment and the only way she could "stop [her] house from burning down" would be to consent to a search of the apartment. In short, the conversation was dominated by Willer's discovery of the scale and white powder; his belief, based on his discovery, that other contraband was in the apartment; and his repeated threats to charge Shatley with everything he would discover in the apartment after he obtained a search warrant using the scale and white powder. From this, it is apparent that Willer's unlawful discovery of the scale and white powder was "inextricably bound up" with and could not be segregated from Shatley's consent.

In addition, Willer's threat to obtain a search warrant on the basis of his discovery of the scale and white powder and Harrison's statement that drugs were sold from the apartment was groundless. First, evidence obtained during an illegal search may not serve as the basis for issuing a search warrant. See <u>People v. Bowen</u>, 164 Ill. App. 3d 164, 177 (1987) ("Where the initial search or arrest

is unlawful neither can form the basis for the issuance of a search warrant and evidence so obtained is inadmissible"); People v. Crowder, 99 Ill. App. 3d 500, 504 (1981) (a search warrant obtained based upon evidence discovered during an illegal search should be quashed). Thus, Willer could not have legally used the scale and white powder--discovered illegally--to obtain a search warrant.

Likewise, Harrison's statement that drugs could be purchased at the apartment, without more, would have been insufficient to constitute probable cause on which to issue a search warrant. See People v. Moser, 356 Ill. App. 3d 900, 908 (2005) (probable cause necessary for the issuance of a search warrant). While hearsay statements based on an informant's tip may serve as the basis for a finding of probable cause on which a search warrant is issued, the tip must be reliable if the facts contained in it are essential to the probable cause finding. People v. Tisler, 103 Ill. 2d 226, 237 (1984). Factors that may be considered in assessing the reliability of an informant's tip include the informant's veracity and basis of knowledge, independent corroboration through police investigation, the level of detail in the tip, and whether the informant had provided reliable tips in the past. Tisler, 103 Ill. 2d at 240-41, 249. Here, the record does not reveal that any reason existed to credit Harrison's statement that drugs could be purchased at the apartment: there was no evidence that Harrison had provided past reliable tips; there was no independent police corroboration of Harrison's tip, aside from the illegal discovery of the scale and white powder; Harrison was an admitted drug user; and Harrison allegedly had just been battered by Shatley and defendant, giving her reason to fabricate information. Accordingly, without other, legally obtained evidence or without greater indicators of reliability, Harrison's statement, like the scale and white powder, could not have served as the basis for the issuance of a search warrant. See Tisler, 103 Ill. 2d at 237 (tip must be reliable to serve as basis of probable cause finding). Thus, Willer's statement that he would obtain a search

warrant on those bases was groundless and was improperly used in eliciting Shatley's consent. See Griffin, 158 Ill. App. 3d at 52 ("absent [officer's] discovery of cocaine during the initial illegal search, police had no basis for obtaining a search warrant. Therefore, the threat by police that they would obtain a warrant was groundless and they could not properly employ this threat in urging defendants to consent").

We acknowledge that whether consent was voluntary is a question of fact (Griffin, 158 Ill. App. 3d at 51), and normally a determination is to be disturbed only if it was against the manifest weight of the evidence (Pitman, 211 Ill. 2d at 512). We note that in the present case, the trial court's determination that Shatley's consent was voluntary was made in the context of the trial court's belief that Willer's entry into the apartment and subsequent discovery of the scale and white powder were legal. Our determination that Willer's entry and discovery of the scale and white powder were illegal alters the factual and legal context in which the assessment of the voluntariness of Shatley's consent is to be made. We conclude that the trial court's finding that Shatley's consent was voluntary was against the manifest weight of the evidence because, under a proper understanding of the relevant circumstances, it is readily apparent that Shatley's consent was "inextricably bound up" with Willer's illegal discovery of the scale and white powder and, thus, involuntary.

As we have determined that Shatley's consent to search was involuntary because it was "inextricably bound up" with Willer's illegal discovery of the scale and white powder, we need not address defendant's other arguments directed against the trial court's finding of voluntariness.

The State argues that even if Shatley's consent was involuntary, the evidence seized during the subsequent search of the apartment would have been admissible under the inevitable-discovery doctrine. The inevitable-discovery doctrine is an exception to the exclusionary rule, which typically

requires the exclusion of any evidence obtained in violation of the fourth amendment. People v. Sutherland, 223 Ill. 2d 187, 227 (2006). Under the inevitable-discovery doctrine, if the State can prove, by a preponderance of the evidence, that the evidence ultimately or inevitably would have been discovered by lawful means, the evidence should be admitted, despite the fact that it was obtained in violation of the fourth amendment. Nix v. Williams, 467 U.S. 431, 444, 81 L. Ed. 2d 377, 387-88, 104 S. Ct. 2501, 2509 (1984); Sutherland, 223 Ill. 2d at 227-28 (inevitable discovery doctrine permits the admission of evidence that would otherwise be inadmissible at trial where the State can prove that the evidence inevitably would have been discovered without reference to the police error or misconduct).

In the present case, the State argues that the evidence seized from defendant's apartment inevitably would have been discovered because (1) Willer would have been able to obtain a search warrant based upon Harrison's statement that drugs were sold from the apartment and upon his discovery of the scale and white powder, and (2) Shatley would have consented to a search of the apartment based solely on Harrison's report of the battery and statement that drugs were sold from the apartment. We disagree.

As we have already concluded that Willer would not have been able to secure a search warrant based only upon Harrison's statement and his discovery of the scale and white powder, we turn directly to the State's contention that the evidence inevitably would have been discovered because Shatley would have consented to a search based upon Harrison's report of the battery and statement that drugs were sold from the apartment. In ruling on the motion to suppress, the trial court found that the inevitable-discovery doctrine applied because Shatley would have consented to a search based on the information Willer had regarding the battery and Harrison's statement that

drugs were being sold from the apartment. The State contends that because defendant did not, in his opening brief, direct a specific argument against this finding, he has forfeited any contention of error he may have with respect to it. We observe that although defendant did not address this specific finding of the trial court, he did argue that Shatley would not have consented to the search absent being presented with Willer's unlawful discovery of the scale and white powder. By arguing that Shatley would not have consented unless she was confronted with that evidence, defendant necessarily argued that she would not have consented under any other circumstances, i.e., she would not have consented solely on the basis of Willer's information regarding the battery and Harrison's statement that drugs were sold from the apartment. Accordingly, we conclude that defendant has not forfeited the claim that the trial court erred in finding that the inevitable discovery doctrine applied.

Based upon our review of the record, including the video recording of Willer's conversation with Shatley regarding consent to search the apartment, we conclude that the State failed to prove by a preponderance of the evidence that Shatley inevitably would have consented to a search of the apartment if she had been told only that she was under investigation for her alleged involvement in the battery of Harrison and that Harrison had informed police that drugs were being sold from Shatley's apartment. In his conversation with Shatley, Willer made two passing references to Harrison: once when he informed Shatley that she was "a suspect in a battery case with that girl in the black car" (presumably Harrison), and once when he threatened to obtain a search warrant based, in part, upon "what the girl [presumably Harrison] who told us says happens here all the time." No other mention was made of Harrison, the battery of Harrison, or Harrison's statement to the police. As discussed above, Willer's discovery of the scale and white powder dominated the conversation,

and Shatley's consent appeared to be given not because of the possibility of being charged with battery or because of Harrison's statement about drugs being sold from the apartment, but instead because of fear of being charged with possessing the scale and white powder Willer had discovered. No testimony was presented regarding the potential effect on Shatley of Harrison's report of the battery and statement that drugs were sold from the apartment. Given that Willer's passing references to Harrison failed to independently elicit any sort of response from Shatley and given the lack of other evidence indicating that Shatley would have consented absent being confronted with Willer's illegal discovery of the scale and white powder, we conclude that the State failed to prove by a preponderance of the evidence that Shatley inevitably would have voluntarily consented to the search of the apartment.

As we conclude that Shatley's consent to search was involuntary and that the evidence found during the subsequent search would not inevitably have been discovered, the trial court erred in denying defendant's motion to suppress the evidence seized during the search of the apartment. See People v. Cox, 295 Ill. App. 3d 666, 676 (1998) (where the evidence was seized in an illegal search, the trial court erred in denying the motion to suppress that evidence); Griffin, 158 Ill. App. 3d at 52 (where the defendant's consent to search was involuntary, the trial court properly granted the motion to suppress).

Finally, defendant contends that his statements to police should have been suppressed because they were made in direct response to being confronted with the evidence that was illegally seized from his apartment. We conclude that defendant has forfeited this contention for failure to raise it in the trial court. Although defendant's written motion to suppress requested that all fruits of the illegal seizure and search, including statements made by defendant, be suppressed, no evidence

regarding defendant's statements to police was presented at the hearing on the motion to suppress, and the trial court made no ruling on whether defendant's statements to police should be suppressed. In fact, from the testimony of the witnesses at the hearing on the motion to suppress, one is not even made aware of the fact that defendant made statements to the police. Further, although at trial defendant renewed his objection to the admission of the evidence he sought to suppress through his motion to suppress, there again was no mention made of defendant's statements to police. In addition, defendant did not object to Willer's testimony at trial regarding defendant's statements, and defendant's only objection to the admission of his written statement was that it referenced the aggravated battery of Harrison. Accordingly, because defendant failed to present to the trial court his contention that his statements to police should have been suppressed, he may not raise the issue for the first time in this appeal. See People v. Adams, 131 Ill. 2d 387, 395 (1989) ("an issue not raised in the trial court is considered waived").

In sum, we conclude that Willer's entry into defendant's apartment and his discovery of the scale and white powder in the master bedroom were unlawful. We also conclude that Shatley's consent to search the apartment was involuntary because Willer exploited the unlawfully discovered scale and white powder in eliciting Shatley's consent. Thus, the evidence seized from the apartment pursuant to Shatley's consent should have been suppressed. The State makes no argument that the error in admitting the illegally seized evidence was harmless. See People v. Simms, 121 Ill. 2d 259, 276 (1988) (where a constitutional error is at issue, the burden is on the State to prove beyond a reasonable doubt that the error did not affect the decision); People v. Rowjee, 308 Ill. App. 3d 179, 186-87 (1999) (same). Without the illegally seized evidence, the State could not prevail at trial because defendant's convictions rested solely upon the illegally seized evidence and his statements

that he owned the illegally seized evidence. Accordingly, defendant's convictions must be reversed outright. See People v. Merriweather, 261 Ill. App. 3d 1050, 1056 (1994); Wilson, 86 Ill. App. 3d at 643.

Given our conclusion that defendant's convictions must be reversed, we need not address his contention that he is entitled to an additional day of credit for time he spent in custody prior to sentencing.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Lake County is reversed.

Reversed.

BOWMAN and JORGENSEN, JJ., concur.