# Illinois Official Reports

## Appellate Court

---

### *People v. Butler*, 2015 IL App (1st) 131870

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT BUTLER, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-13-1870 |
| Filed | December 24, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-2148801; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Reversed; cause remanded. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Christopher Kopacz, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Veronica Calderon Malavia, Christine Cook, and Edward Wasilewski, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE COBBS delivered the judgment of the court, with opinion.<br>Justices Howse and Ellis concurred in the judgment and opinion. |

**OPINION**

¶ 1 Following a bench trial, defendant Robert Butler was found guilty of second degree murder pursuant to section 9-2(a)(2) of the Criminal Code of 1961 (Code) (720 ILCS 5/9-2(a)(2) (West 2010)), and was sentenced to 13 years in prison. On appeal, defendant asserts that the trial court erred in denying his pretrial motion to suppress a text message found during a warrantless search of his cell phone.

¶ 2 BACKGROUND

¶ 3 The record reveals that defendant and codefendant Cordero Amos,[1] who is not a party to this appeal, were charged with eight counts of first degree murder, two counts of home invasion and one count of residential burglary in relation to a shooting that occurred on October 13, 2010, which resulted in the death of Lawrence Stubbs. Prior to trial, defendant filed a motion to suppress, asserting that a police officer seized his cell phone and retrieved text messages from it without a warrant, probable cause, consent, or a showing of exigency.

¶ 4 At the hearing on the motion, Chicago police officer Thomas Shannon testified that around noon on October 13, 2010, he was in the vicinity of Little Company of Mary Hospital completing paperwork relating to a car accident, when he heard a radio dispatch regarding a shooting on the 8900 block of South Bishop. The suspected offender was described as a black male wearing black clothing. Shortly thereafter, Officer Shannon saw a gray car speed into the hospital driveway, stop swiftly, and then drive away after a passenger in the car pushed another passenger out of the backseat. Officer Shannon called in the license plate number of the car, and then approached the person, who he identified in court as defendant, to check for injuries. Defendant had been shot in the buttocks and was bleeding, but was able to speak and understand what was said to him. Officer Shannon asked defendant what had happened, and defendant said that he had been shot at 71st and Ashland. Officer Shannon contacted his dispatch and asked if any shootings had been reported in that area, but did not receive a response at that time.

¶ 5 Officer Shannon further testified that hospital staff then took defendant inside the hospital to the emergency room, and he accompanied them; however, he was not in the immediate vicinity for the entire time the hospital staff members were speaking with defendant. Although defendant was in "pretty bad shape" at that time, he was able to speak and never lost consciousness. In order to tend to his medical needs, hospital staff gathered all of defendant's clothes and personal belongings, and it was at this point that Officer Shannon noticed that defendant had a cell phone. Officer Shannon testified that he obtained the cell phone because he intended to call someone in defendant's family, but acknowledged that (1) he did not know whether hospital staff had already contacted defendant's next of kin, (2) he did not ask hospital staff whether they had done so or whether defendant had provided them with contact information for his next of kin, (3) he did not have a search warrant to go into defendant's cell phone and defendant did not give him verbal or written consent to do so, and (4) defendant did not ask him to notify his next of kin.

_____

[1]Defendant and codefendant had a joint, but severed, trial, with codefendant's trial being a trial by jury.

¶ 6        Officer Shannon further testified that approximately five minutes after defendant's arrival at the hospital, he took defendant's cell phone outside the hospital. He reiterated that he intended to contact someone in defendant's family, and testified that because he was not familiar with that particular phone, he hit a button that caused him to "end[ ] up getting into the text messages." He then saw a text message that had been sent approximately two hours earlier that day to someone named "Blackee," and which stated, "I needa pipe cuzz, asap [*sic*]." Once he read this message, he "immediately stop[ped] playing with [defendant's] phone." It was at that point that he received a response from dispatch informing him that there was no record of a shooting at 71st and Ashland.

¶ 7        Officer Shannon testified that he then requested that detectives and an evidence technician be sent to the hospital to investigate. The factors that caused him to do so included (1) the dispatch he heard earlier regarding the shooting at 89th and Bishop, (2) the fact that defendant was wearing black clothes and thus matched the description of the suspected shooter at 89th and Bishop, (3) the contents of the text message he read on defendant's cell phone, and (4) defendant's inconsistent story regarding where he had been shot. He then went and spoke to defendant and told him that there had been no shooting at 71st and Ashland, at which point defendant told him that he was involved in the shooting at the 8900 block of South Bishop. Officer Shannon denied that when defendant first arrived at the hospital he immediately thought defendant might be the offender from that shooting.

¶ 8        When detectives arrived at the hospital, Officer Shannon gave them all of defendant's possessions, including the cell phone. Officer Shannon testified that based on the text message he saw on the phone, detectives subsequently secured a search warrant to go into the phone itself. Officer Shannon further testified that he did not place handcuffs on defendant or take him into custody, and that he would have allowed defendant to leave the hospital at any point in time. The court took notice that one must push different buttons on a cell phone to access contacts and text messages.

¶ 9        Defendant testified and acknowledged that he initially told Officer Shannon that he had been shot at 71st and Ashland. Defendant further testified that upon arriving at the emergency room, a nurse asked him if he wanted to call anyone, and he told her to call his sister. He never asked the police to call someone from his cell phone and he never saw police going through his cell phone.

¶ 10        The court denied defendant's motion to suppress the text message found on his cell phone. In doing so, the court reasoned that at the time Officer Shannon looked at defendant's phone, it was not a custodial event and Officer Shannon was not looking for evidence of criminality but, rather, was merely looking for a way to contact defendant's family because defendant appeared to be in some distress and "seemed to not be in a position to communicate well by himself." The court further stated that "[defendant] had already made some misrepresentations perhaps about where the shooting had taken place. The officer is just doing a cursory checking out." The court also noted that "pipe" is another term for "gun."

¶ 11        At trial, C'Erica Rutledge, a friend of Stubbs', testified that on October 13, 2010, Stubbs came to her home at 8954 South Bishop to pick up his cell phone. After she gave him the phone, Stubbs began to leave the house and she heard him open the screen door. At that point, Rutledge heard gunshots, so she fell to the floor. In all, she heard approximately 15 gunshots. After the gunshots stopped, Stubbs re-entered the house, showed her a gunshot

wound in his back, and said "they shot me." Stubbs did not tell her anything further about what had happened. Rutledge testified that she did not see a gun next to Stubbs or in his possession.

¶ 12 William White, a friend of Stubbs', testified that at approximately 11 a.m. on October 13, 2010, he was walking near 89th and Bishop when he heard about 25 gunshots. Once the gunshots stopped, he saw a "greenish" Dodge Stratus come out of a nearby alley. White then saw two men he did not recognize running in his direction. Both men were wearing black clothing and one was wearing a hat. One of the men, whom White identified in court as defendant, was dark skinned and the other man, whom White identified in court as codefendant, had lighter skin. White saw both men get into the backseat of the Dodge Stratus, and then the driver of the car reversed and drove down 89th toward Racine. White acknowledged that he did not see the shooting.

¶ 13 White further testified that later that afternoon, he was arrested for possessing a gun; however, he had not been in possession of that gun at the time of the shooting. At the police station, he told police what he had seen earlier that day near 89th and Bishop. Police showed him a photo array, and he identified defendant as the darker-skinned man he saw running from 89th and Bishop following the gunshots. The next day, White viewed a physical lineup and made the same identification of defendant. Upon viewing a second photo array, White tentatively identified codefendant as the other man he saw running from the scene.

¶ 14 Pacola Bibbs, a Cook County sheriff's department employee, testified that on October 13, 2010, she and her husband were visiting her mother, who lived at 8939 South Bishop. Bibbs' husband had just exited the house, when she heard two or three gunshots. Bibbs feared that her husband had been shot, so she went outside to check on him, and saw two men running towards the train tracks. One of the men was tall and dark skinned and the other one was shorter and light skinned and was carrying a gun. Bibbs heard a female screaming for help from a nearby house, so she ran to help her and called 911. When police arrived, Bibbs told them what she had seen. The following day, she saw a photo array at the police station and identified a picture of codefendant as the lighter-skinned man she had seen running with a gun. Bibbs also viewed a physical lineup, but she was not able to identify anyone. Bibbs viewed another physical lineup on November 6, 2010, and she tentatively identified two people as possibly being the lighter-skinned man she saw running from the scene.

¶ 15 Tiffany Bennett testified that around 9 or 10 a.m. on October 13, 2010, she received a call from her friend Marcus Russell, who asked her to switch cars with him. Russell did not tell her why he needed to do so, but said that it was an emergency. She proceeded to a McDonald's located at 95th and Halsted, where she met Russell and switched her gray Dodge Stratus for his blue Charger. Marcus had three other people with him; Rob, who she identified in court as defendant, Red, who she identified in court as codefendant, and a man she did not know. Marcus and Red, and possibly the unidentified man, returned the car to her sometime between 5 and 6 p.m. that day. Russell told her that defendant had been shot, but did not give her any details about the shooting or say whether he had been present for it. Later that evening, Bennett received a call from her father, who told her that the police were at his home and needed to speak with her. Bennett proceeded to her father's house and gave police permission to look in her car. Police found blood on the backseat of her car. There had been no blood there that morning when she exchanged cars with Russell, nor was defendant injured in any way at that time.

¶ 16          Officer Shannon testified consistently with his testimony at the hearing on the motion to quash and suppress evidence regarding the circumstances surrounding defendant's arrival at the hospital, regarding how he obtained defendant's cell phone, and the content of the text message he saw on that phone. He further testified that "pipe" is a street term for gun.

¶ 17          The State presented evidence that police collected and inventoried 15 discharged cartridge casings and one fired bullet from the crime scene. Eight of the cartridge casings were recovered from the front parkway area, and the remaining seven cartridge casings, as well as the fired bullet, were recovered from the living room. Additionally, the coroner recovered one bullet from Stubbs' body during the autopsy he performed on it. Ballistics experts analyzed this physical evidence and concluded that the cartridge casings and bullets had been fired from three different guns. They further concluded that four of the casings recovered from the front parkway, as well as the fired bullet recovered in the living room, and the bullet recovered from Stubbs' body, were fired from the same gun, which was a gun that was recovered two days after the shooting in an unrelated arrest. The ballistics experts also concluded that seven cartridge casings recovered in the living room and one cartridge casing recovered from the parkway were fired from the same gun, which was a gun recovered one year after the shooting during an unrelated search warrant. None of the evidence was fired from the gun recovered from William White.

¶ 18          Detective Brian Johnson testified that on October 13, 2010, he and Detective Dougherty went to Christ Hospital, where defendant had been transferred, and spoke with Officer Shannon, who gave them defendant's belongings, including his cell phone. He and Detective Dougherty then interviewed defendant. Defendant told them that he had been walking southbound on Bishop, approaching 90th Street, when he observed two individuals who were arguing on a porch begin shooting at one another. Defendant was struck by gunfire, so he ran to a nearby Auto Zone store and called his brother for a ride. Detective Johnson then proceeded to the Auto Zone store and spoke with the manager, after which he viewed the store's surveillance video for the time in question, but did not see any footage of defendant. After defendant was finished being treated at Christ Hospital on October 13, 2010, he was released into police custody and transported to the police station. He arrived there around 8:30 p.m. and was placed in an interview room. Detective Johnson prepared a search warrant for defendant's cell phone and a judge signed it. They then took the cell phone to a tech lab where they attempted to obtain information from it.

¶ 19          Detective Johnson further testified that at approximately 10 p.m. that night, he and Detective Dougherty advised defendant of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant acknowledged those rights and agreed to speak with them. Defendant then told them that he had been in a vehicle with Russell, an individual he knew by the name "Von," and codefendant, who is called "Red." Detective Johnson asked defendant about the text message that was found on his cell phone, and defendant told him that he had recently been robbed and he sent that message to a cousin to request a handgun for protection because he was afraid. Detectives Johnson and Dougherty spoke again with defendant at approximately 10:30 p.m. on October 14, 2010. That time, defendant told them he was walking after having been dropped off to pick up some weed, when he saw Red arguing with Stubbs on the porch and that he was shot when the two exchanged gunfire. Detective Johnson testified that he then confronted defendant with information he obtained

from Bennett, at which point defendant "changed his story," as reflected in the recorded statement he gave at approximately 11:50 a.m. That statement was then played in open court.

¶ 20 In his statement, defendant told police that he went to McDonald's with Russell, codefendant and "Von" to switch cars with a girl named Tiffany. According to Russell, the switch was necessary because someone he did not recognize, perhaps from another gang, had previously fired at his car. After the switch, and upon arriving at 89th and Bishop, defendant was told only that he was supposed to walk down the block and act as "security detail" for codefendant and "holler" if he saw someone approach codefendant. Defendant knew that codefendant had a gun. Defendant was in the middle of the block, and codefendant was at the walkway leading up to a house, when someone walked out of the house with a gun in hand and started shooting. As soon as defendant turned to run, he was shot. He and codefendant ran back to the car, and defendant told them to drive him to a hospital. Upon being asked about the text message that was found on his cell phone, defendant told the detectives that he needed a gun because some men had recently tried to rob him and his daughter at a bus stop. Defendant further stated that he never received a gun as a result of the text he sent, and invited the detectives to call the number shown in the text message to confirm that the person he texted did not respond to him. Nowhere in his statement does defendant state that he knew what the others were planning or that he was involved in planning the shooting that occurred on 89th and Bishop.

¶ 21 The parties stipulated that Dr. Cogan performed an autopsy on Stubbs, during which he recovered a bullet from Stubbs' abdominal cavity. Dr. Cogan concluded that Stubbs suffered a gunshot wound to his back which revealed no evidence of close-range firing, and that this wound was Stubbs' cause of death. The parties further stipulated that an evidence technician administered a gunshot residue kit to defendant on October 13, 2010, at 11:53 a.m. in the emergency room at Little Company of Mary Hospital, and that the forensic scientist who examined that kit opined that defendant may not have discharged a firearm with either hand. If he did so, then the particles were removed by activity, were not deposited or were not detected by the procedure. The parties further stipulated that Officer Shannon's testimony from the hearing on the motion to suppress would be incorporated into the record, save for testimony excludable due to hearsay.

¶ 22 The State rested and defendant made a motion for judgment of acquittal, which the trial court denied. Defendant then asked the court to reconsider its ruling on his motion to suppress in light of the evidence presented at trial. The court denied that motion and the defense rested.

¶ 23 During closing arguments, the State argued, *inter alia*, that defendant was a member of a team that "went out looking to kill," and that his designated responsibility as part of that team was obtaining a weapon and being a lookout. The State thus argued that defendant was accountable for Stubbs' murder. Defense counsel argued that no evidence was presented (1) that defendant had a gun or discharged one or that he received a gun as a result of the text that was on his cell phone, (2) that he knew what codefendant's plans were, or (3) that defendant was involved in a common scheme or design. Defense counsel argued that the State merely showed that defendant was present at the scene, which is insufficient to find him guilty by accountability.

¶ 24 The court found defendant guilty of second degree murder. In doing so, the court found that the text message sent before the shooting reflected that defendant had requested that an

unknown cousin bring him a pipe, meaning a gun, and was "compelling evidence." The court stated that the evidence showed that Stubbs was also armed and that although the manner in which the shooting occurred was "not exactly clear from the record," it believed that defendant "went there with evil intent."

¶ 25    Defendant filed a posttrial motion in which he argued, *inter alia*, that the court erred in denying his motion to suppress the text message. The court denied the motion and the case proceeded to a sentencing hearing. Following evidence in aggravation and mitigation, the court sentenced defendant to 13 years in prison. Defendant now appeals, arguing that the trial court erred in denying his motion to suppress the text message found on his cell phone.

¶ 26                                    ANALYSIS

¶ 27    In reviewing an order denying defendant's motion to suppress evidence, mixed questions of law and fact are presented. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). Factual findings made by the trial court will be upheld unless they are against the manifest weight of the evidence, whereas the trial court's application of the facts to the issues presented and the ultimate question of whether the evidence should be suppressed is subject to *de novo* review. *Id.* Here, defendant does not contest the factual findings made by the trial court in arriving at its decision, but argues that a *de novo* review of his legal claim reflects that the text message found on his cell phone should be suppressed.

¶ 28                              *Riley v. California*

¶ 29    The fourth amendment to the United States Constitution guarantees the right of the people to be free from unreasonable searches and seizures. U.S. Const., amend. IV; *People v. Gherna*, 203 Ill. 2d 165, 176 (2003). Accordingly, wherever an individual harbors a reasonable expectation of privacy, he is entitled to be free from unreasonable government intrusion. *Gherna*, 203 Ill. 2d at 176 (quoting *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). Reasonableness generally requires a warrant supported by probable cause. *People v. Trisby*, 2013 IL App (1st) 112552, ¶ 11 (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)).

¶ 30    In this case, we are dealing with digital information, in the form of a text message, that was discovered on defendant's cell phone during a warrantless search. Recently, in *Riley v. California*, 573 U.S. ___, 134 S. Ct. 2473 (2014), the United States Supreme Court dealt with a similar issue. In *Riley*, the defendants in two separate cases filed motions to suppress digital information that was gleaned from their cell phones, which were searched after the defendants had been arrested. *Id.* at ___, 134 S. Ct. at 2480-82. In both cases, the trial court denied the defendants' motions to suppress and the Supreme Court reversed those judgments on appeal, holding that officers must generally secure a warrant before conducting a search of data on cell phones. *Id.* at ___, ___, 134 S. Ct. at 2485, 2495. In doing so, the Court balanced the degree to which a search of data contained in a cell phone intrudes upon a person's privacy interests against the degree to which such a search is necessary to promote legitimate government interests such as preventing the destruction of evidence and harm to officers. *Id.* at ___, 134 S. Ct. at 2484. In arriving at its decision, the Court noted that given the current state of cell phone technology, modern cell phones contain vast quantities of personal information, have an immense storage capacity, and are in essence mini computers. *Id.* at ___, 134 S. Ct. at 2488-89. The Court further noted that given the quantity and quality of information contained in a cell phone, a search of such a device would typically expose far

more private information than the most exhaustive search of a house. *Id.* at ___, 134 S. Ct. at 2490-91. Although the Court held that in general an officer cannot search the contents of a cell phone without a warrant, even if it is a search conducted incident to a lawful arrest, it recognized that depending on the circumstances, certain other exceptions to the warrant requirement may apply to a given situation. *Id.* at ___, 134 S. Ct. at 2493-94.

¶ 31 Defendant here argues that in light of *Riley*, the warrantless search of his cell phone was unconstitutional, and, accordingly, the text message discovered during the search should be suppressed. Although the State does not contest the applicability of *Riley* in this case,[2] it contends that the community caretaking exception to the warrant requirement applies.

¶ 32                                     Community Caretaking

¶ 33 The State bears the burden of presenting evidence showing that a warrantless search was justified under a recognized exception to the warrant requirement. *People v. Kowalski*, 2011 IL App (2d) 100237, ¶ 9. Community caretaking constitutes an exception to the warrant requirement and is invoked to validate a search or a seizure as reasonable under the fourth amendment; it is not relevant to determining whether police conduct amounts to a seizure in the first place. *People v. Luedemann*, 222 Ill. 2d 530, 546, 548 (2006). "Rather than describing a tier of police-citizen encounters, community caretaking refers to a capacity in which the police act when they are performing some task unrelated to the investigation of crime, such as helping children find their parents, mediating noise disputes, responding to calls about missing persons or sick neighbors, or helping inebriates find their way home." *People v. McDonough*, 239 Ill. 2d 260, 269 (2010).

¶ 34 In general, the following two criteria must be present for the community caretaking exception to apply: (1) when viewed objectively, the officer's actions constitute the performance of some function other than the investigation of a crime, and (2) the search or seizure must be reasonable because it was undertaken to protect the safety of the general public. *Id.* at 272. Reasonableness is measured objectively by examining the totality of the circumstances. *Id.* (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). In deciding whether this exception applies to a particular set of circumstances, a court must balance a person's interest in going about his or her business free from police interference against the public's interest in having police officers perform services in addition to strictly law enforcement. *Id.* (citing *Luedemann*, 222 Ill. 2d at 547).

¶ 35 In this case, defendant concedes that Officer Shannon was not investigating a crime at the time he searched the cell phone, but maintains that the officer's stated reason for conducting the search, to contact defendant's next of kin, was wholly unnecessary and thus unreasonable. The State argues that Officer Shannon's actions "clearly" fall within the community caretaking exception, but cites no support for this assertion and acknowledges that this court has not previously addressed whether the community caretaking exception

---

[2]We note that although no case dealing with the warrantless search of the digital contents of a cell phone, such as in *Riley*, has been decided in Illinois, in general, the Illinois Supreme Court "interprets the search and seizure clause of the Illinois Constitution in 'limited lockstep' with its federal counterpart." *People v. LeFlore*, 2015 IL 116799, ¶ 16 (quoting *People v. Caballes*, 221 Ill. 2d 282, 314 (2006)).

applies to an officer's warrantless search of an injured person's cell phone in order to contact a family member.

¶ 36     According to the State, Officer Shannon's "limited use" of defendant's cell phone to contact defendant's family members and notify them that defendant had been shot and where they could find him falls under the community caretaking exception because such an action protects the safety of the public in the following ways: (1) providing this information to defendant's family, (2) it could have alerted medical personnel as to a possible medical condition of significance, (3) it could have alerted defendant's family regarding potential harm that could have been headed their way, and (4) it could have provided police with possible information regarding the identity of defendant himself and/or the person who shot him.

¶ 37     Here, however, Officer Shannon did not testify that he sought to use defendant's cell phone for any other purpose than to inform defendant's family that he had been shot. He did not testify that he sought to ascertain defendant's identity or to gather defendant's medical history from his family. Nor did Officer Shannon testify that he sought to warn defendant's family that harm could be headed their way or to ask them if they knew the identity of defendant's shooter. In fact, if defendant's family already knew who had shot defendant, there would be no need for Officer Shannon to call and inform them that he had been shot. Further, Officer Shannon testified that defendant was able to understand and answer questions, and that he never lost consciousness. That being the case, information regarding defendant's identity and his medical history could have been obtained from defendant himself.

¶ 38     Turning to Officer Shannon's stated objective in searching defendant's cell phone, to notify defendant's family, we find that Officer Shannon had better and less intrusive means of accomplishing this task. As previously mentioned, the record reveals that defendant was alert and able to communicate at the time Officer Shannon conducted the search. Thus, Officer Shannon could have asked defendant if he would like the officer to contact anyone on defendant's behalf, and if so, for their contact information. Officer Shannon could also have inquired of hospital staff whether defendant's family had already been contacted or if defendant had provided them with contact information. The record reveals that at the time Officer Shannon searched defendant's cell phone, defendant had already asked a nurse to call his sister. However, Officer Shannon made no effort to ascertain whether hospital staff had already contacted defendant's family or to speak to defendant about this issue. Rather, he took it upon himself to obtain defendant's cell phone with the intent of searching through it for an appropriate person to contact. This manner of proceeding is not only intrusive, but highly misguided, given that Officer Shannon did not know the names of defendant's family members and thus would not have known which of the contacts in defendant's phone was a relative. Aimlessly scrolling through a list of unknown names and/or calling each and every contact in defendant's cell phone is neither reasonable nor serves the purpose of protecting defendant or the general public.

¶ 39     Additionally, we reject the State's contention that the balance between defendant's privacy interest and society's interest in the welfare of its citizens favors allowing an officer to reach out and notify an injured person's family as to their medical status by searching his or her cell phone. We find that this overly generalized assertion fails to take into account the detailed discussion in *Riley* in which the Supreme Court acknowledged that due to the current

state of cell phone technology, a search of a cell phone contains an immense amount of digital information pertaining to a person's "privacies of life" and that as a result, cell phones implicate privacy concerns far beyond those implicated in searches of objects such as purses or wallets. (Internal quotation marks omitted.) *Riley*, 573 U.S. at ___, ___, 134 S. Ct. at 2488-91, 2494-95. Given that defendant's privacy interest in the contents of his cell phone was so substantial, we find that Officer Shannon's actions in conducting a warrantless search of that phone in order to contact defendant's family do not fall under the community caretaking exception where he had less intrusive means at his disposal of accomplishing the same task.

¶ 40                            Implied Consent

¶ 41     The State also contends that defendant gave implied consent for others, including Officer Shannon, to use his cell phone. In so arguing, the State points to defendant's testimony that upon arriving to the emergency room he asked a nurse to call his sister. The State maintains that it is only reasonable to infer that Officer Shannon overheard this request and decided to carry it out by using defendant's cell phone. According to the State, given that defendant specifically requested that his sister be contacted, use of his cell phone was "logically inevitable," and it is inconsequential who in particular acted upon his request.

¶ 42     Even assuming that Officer Shannon overheard defendant make this request, the fact remains that defendant made the request to a nurse, not to Officer Shannon. Consent is determined by whether a reasonable person would have understood by an individual's words, acts or conduct, that consent had been granted. *People v. Burton*, 409 Ill. App. 3d 321, 328-29 (2011). Here, we find that no reasonable person would have understood that defendant had granted consent for Officer Shannon, or anyone else, to search his cell phone merely by asking a nurse to call his sister. Further, contrary to the State's contention, we do not find that defendant's request constituted a relinquishment of his privacy expectation in his cell phone. This is particularly so where no evidence was presented that defendant asked the nurse to use his cell phone in order to call his sister.

¶ 43                          Exigent Circumstances

¶ 44     In the alternative, the State argues that independent probable cause and exigent circumstances existed to justify Officer Shannon's seizure of defendant's phone until a warrant was secured. This argument fails however because in this case Officer Shannon did not merely seize defendant's cell phone and secure it until a search warrant could be obtained but, rather, seized it and immediately searched its contents.

¶ 45     That said, we observe that courts consider the following factors in determining whether exigent circumstances justify a warrantless search: (1) whether the offense being investigated was recently committed; (2) whether there was any deliberate or unjustified delay by police during which a warrant could have been obtained; (3) whether a grave and/or violent offense is involved; (4) whether police reasonably believed that the suspect was armed; (5) whether the police officers were acting upon a clear showing of probable cause; (6) the likelihood that the suspect would have escaped if not swiftly apprehended; and (7) a strong reason to believe that the suspect was on the premises. *People v. Davis*, 398 Ill. App. 3d 940, 948 (2010) (quoting *People v. Foskey*, 136 Ill. 2d 66, 75 (1990)). These factors are neither exhaustive, nor to be rigidly applied in every case. *Id.* Rather, in deciding whether exigent circumstances

are present, the totality of the circumstances are considered; and those circumstances must militate against delay to justify an officer's decision to proceed without a warrant. *Id.*

¶ 46    In considering the totality of the circumstances of this case, we find that they do not militate against delay but, rather, reflect that Officer Shannon was not justified in proceeding with a warrantless search of defendant's cell phone. Although the shooting that took place at 89th and Bishop was a violent offense that had been committed recently, the remainder of the circumstances weigh against the presence of exigent circumstances. According to Officer Shannon's own testimony, he searched defendant's cell phone only after all of defendant's clothing and personal effects had been removed from him by hospital staff. Thus, given that no evidence was presented that a gun was included in those personal effects, Officer Shannon could not have reasonably believed that defendant was armed at that time. Nor was there a likelihood that defendant, who was in a hospital emergency room being treated for a gunshot wound, would have escaped prior to Officer Shannon obtaining a search warrant.

¶ 47    Further, even if we were to assume that Officer Shannon had probable cause to believe that defendant was involved in the shooting at 89th and Bishop, we reject the State's argument that Officer Shannon had probable cause to believe that defendant's phone contained vital information related to that shooting. The State points to no evidence to support such a conclusion but, rather, merely points out that in *Riley*, the Supreme Court recognized that a cell phone can store a wide range of information relating to criminality, and that this information is subject to deletion by the offender. Notably, in *Riley*, the Supreme Court rejected the United States' argument that a warrantless search of a cell phone should be allowed whenever it is reasonable to believe the phone contained evidence of a crime. *Riley*, 573 U.S. at ___, 134 S. Ct. at 2492. In doing so, the Court noted that "[i]t would be a particularly inexperienced or unimaginative law enforcement officer who could not come up with several reasons to suppose evidence of just about any crime could be found on a cell phone." *Id.* at ___, 134 S. Ct. at 2492.

¶ 48    In this case, at the time Officer Shannon conducted the warrantless search, defendant was not in possession of his cell phone and thus was not in a position to manually delete any information on it.[3] Here, there was no immediate and clear danger to the police or others (see *Foskey*, 136 Ill. 2d at 78-79, and *Davis*, 398 Ill. App. 3d at 950), and there was no reason Officer Shannon could not have waited and secured a warrant prior to searching defendant's cell phone.[4] In sum, based on the totality of the circumstances, we find that the State has failed to show that Officer Shannon's warrantless search of defendant's cell phone was justified by exigent circumstances.

---

[3]We note that the State makes a passing reference to the fact that the contents of cell phones are subject to remote wiping. Given that the State does not develop an argument in relation to this potential risk, we do not address it. That said, we note that it does not appear that defendant would have known that there was any need to delete information remotely, given that he testified that he did not know that the police had obtained his cell phone.

[4]For a search warrant to be valid it must be supported by probable cause, meaning that a sufficient nexus must be established between the criminal offense, the item to be seized, and the place to be searched. *People v. Lyons*, 373 Ill. App. 3d 1124, 1128 (2007). We make no determination as to whether, without the contents of the text message at issue, an attempt to obtain a search warrant would have been successful.

- 11 -

¶ 49                    Inevitable Discovery

¶ 50    Further in the alternative, the State argues that the inevitable discovery exception to the exclusionary rule applies here. Pursuant to this exception, evidence that otherwise would be inadmissible may be admitted if the prosecution can show that the evidence would inevitably have been discovered without reference to the police error or misconduct. *People v. Edwards*, 144 Ill. 2d 108, 142 (1991) (quoting *Nix v. Williams*, 467 U.S. 431, 448 (1984)). The State maintains that the contents of the text message would inevitably have been discovered due to the search warrant that was subsequently issued, which allowed authorities to search the cell phone. We disagree.

¶ 51    The State is correct that the police obtained a search warrant to gain access to defendant's cell phone. However, Officer Shannon testified that the search warrant was obtained based on the content of the text message that he saw on defendant's cell phone and which he turned over to the detectives who he called to investigate the case. Had Officer Shannon not seen the text message as a result of his warrantless search of the cell phone, the investigating detectives would not have had this information with which to support a request that a judge sign a search warrant. Evidence obtained during an illegal search cannot serve as the basis for the issuance of a search warrant. *Davis*, 398 Ill. App. 3d at 958 (quoting *People v. Bowen*, 164 Ill. App. 3d 164, 177 (1987) (holding that evidence so obtained is inadmissible)). Accordingly, we find that the evidence at issue would not inevitably have been discovered without reference to the police error or misconduct, and the exclusionary rule is applicable in this case.

¶ 52                    Harmless Error

¶ 53    The State further argues that even if the trial court erred in denying defendant's motion to suppress the text message, the error was harmless because overwhelming evidence of defendant's guilt was presented at trial. Defendant, however, contends that without the contents of the text message, no evidence was presented at trial which would support a conviction based on accountability, and thus the error cannot be considered harmless.

¶ 54    Some constitutional errors may be so insignificant that they may be considered harmless error, however, before a federal constitutional error may be declared harmless, the State must show that the error at issue was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 22-24 (1967). Three approaches for ascertaining error pursuant to *Chapman* have been noted: (1) determining whether the error might have contributed to the defendant's conviction; (2) whether overwhelming evidence supports defendant's conviction; and (3) determining whether the evidence at issue is cumulative or merely duplicative of properly admitted evidence. *People v. Wilkerson*, 87 Ill. 2d 151, 157 (1981) (citing *Fahy v. Connecticut*, 375 U.S. 85 (1963), *Milton v. Wainwright*, 407 U.S. 371 (1972), and *Harrington v. California*, 395 U.S. 250 (1969)). We find that none of these ways of viewing this issue lead to the conclusion that the error here was harmless beyond a reasonable doubt.

¶ 55    In this case, none of the witnesses testified that they saw defendant fire a gun or saw a gun in his possession, and the gunshot residue test that was performed was negative for the presence of gunshot residue. Accordingly, defendant was found guilty by accountability. Under Illinois law, a person is legally accountable for the conduct of another when, either before or during the commission of the offense, with the intent to promote or facilitate the commission thereof, he aids, abets, or attempts to aid that person in planning or committing

the offense. 720 ILCS 5/5-2(c) (West 2010). Although active participation is not required to be found guilty under a theory of accountability (*People v. Taylor*, 164 Ill. 2d 131, 140 (1995)), to prove defendant had the requisite intent, the State must show that either defendant shared the criminal intent of the principal or that there was a common criminal design. *In re W.C.*, 167 Ill. 2d 307, 337 (1995). Mere presence at the scene of a crime is insufficient to hold someone accountable for the acts of another. *People v. Caffey*, 205 Ill. 2d 52, 117 (2001).

¶ 56    In arguing that any error was harmless, the State summarizes the evidence that was presented and contends that it overwhelmingly supported defendant's conviction. However, aside from the content of the text message, the evidence merely established that defendant was present at the scene, which on its own, is insufficient to support a conviction that is based on accountability. Bennett testified that defendant was present when she exchanged her car, a Dodge Stratus, with Russell. White testified that he saw defendant running from the scene after the shooting and leave in a Dodge Stratus. In his statement, defendant also placed himself at the scene, but did not state that he knew what codefendant's plans were when they arrived at 89th and Bishop. Aside from the content of the text message, no evidence was presented showing that defendant may have been part of common plan or scheme relating to a shooting, and we thus find that it was not overwhelming evidence of defendant's guilt by accountability. Further, the content of the text message was not presented by way of other evidence and thus was not duplicative or cumulative. Finally, given that the trial court stated that the content of the text message was "compelling" evidence, we find that it contributed to defendant's conviction, and, accordingly, that the State has failed to show that the error was harmless beyond a reasonable doubt.

¶ 57                                        Attenuation

¶ 58    Defendant also argues, and the State concedes, that this case should be remanded for an attenuation hearing to determine whether his statement to police was the fruit of the unlawful search of his cell phone. It is uncontested that defendant gave his recorded statement after having been confronted with the content of the text message that was recovered during Officer Shannon's improper search of his cell phone. Accordingly, it must be determined whether this confession was obtained by exploitation of the illegal search of his cell phone, or if it was obtained by means sufficiently distinguishable so as to be purged of the primary taint of illegality. *People v. Jackson*, 374 Ill. App. 3d 93, 101 (2007). The State bears the burden of proving attenuation. *Id.* at 102.

¶ 59    The following four factors are considered in determining whether a confession was a product of an illegal search or arrest, or was purged of the initial taint: "(1) the temporal proximity between the [illegal search or] arrest and the confession; (2) the presence of intervening circumstances; (3) the purpose and flagrancy of the police misconduct; and (4) whether *Miranda* warnings were given." *People v. Ollie*, 333 Ill. App. 3d 971, 984-85 (2002) (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). However, we find that the record before this court is insufficient to allow us to make an independent determination on the matter of attenuation, and thus, the proper course of action is to remand this case to the trial court with directions to conduct an attenuation hearing to determine whether defendant's statement was sufficiently attenuated from the illegal search of his cell phone so as to render

it admissible. *Id.* at 987.

¶ 60                              CONCLUSION

¶ 61        For the foregoing reasons, we reverse the judgment of the circuit court of Cook County denying defendant's motion to suppress the text message, as well as reverse defendant's conviction. We remand this cause for a new trial, which is to be held after an attenuation hearing is held to determine whether defendant's statement should also be suppressed.

¶ 62        Reversed; cause remanded.