NOTICE
Decision filed 12/23/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230603-U

NO. 5-23-0603

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | De Witt County. |
| v. | ) ) | No. 23-CM-21 |
| MICHAEL A. TILLEY, | ) ) ) | Honorable Karle E. Koritz, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CATES delivered the judgment of the court.
Justices Vaughan and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: The evidence was sufficient to prove beyond a reasonable doubt that the defendant's conduct materially impeded a police officer from performing an authorized act within his official capacity, and the defendant's conviction is affirmed.

¶ 2    Following a bench trial, the defendant, Michael A. Tilley, was found guilty of resisting or obstructing a peace officer (720 ILCS 5/31-1 (West 2022)). The defendant was sentenced to 12 months of conditional discharge, to complete 100 hours of public service work in the first 10 months, and 1 day in jail with credit for time served. On appeal, the defendant argues that his conviction for resisting or obstructing a peace officer should be reversed because the State failed to prove beyond a reasonable doubt that the defendant materially impeded or hindered the officers during their investigation and that the officers were engaged in an authorized act within their official capacities. We affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4      On April 17, 2023, the defendant was charged by information with resisting or obstructing a peace officer. The State alleged that the defendant knowingly resisted or obstructed Sergeant Jacob Jostes, a peace officer, knowing Jostes to be a peace officer, in performing an authorized act when he refused to allow Jostes entry into the residence to investigate a domestic battery complaint and a woman screaming.

¶ 5      On July 24, 2023, the case proceeded to bench trial. During the State's case, it called two witnesses, Sergeant Jacob Jostes and Officer Patrick Cook. Jostes testified that he was a sergeant for the Clinton Police Department and had been a police officer for seven years. Jostes also testified about the training he had received regarding how to respond to domestic incidents, including instruction on how to approach the residence. He indicated that domestic disturbances are the most volatile situations that police officers encounter, and that domestic calls are dangerous for officers, in part, because it is unknown whether there are weapons present in the home. Jostes estimated that he had responded to approximately 500 domestic calls during his career.

¶ 6      During Jostes's testimony, the State offered into evidence a recording from the dash cam video taken the night of the defendant's arrest. Jostes explained that the Clinton Police Department did not have body cameras. Clinton police officers wore microphones on their uniforms. The microphones were synced with the dash cams inside their police vehicles. Sounds or conversation picked up by the microphones were recorded by the dash cam. The microphones continued to record as the officer moved away from the vehicle. As a result, the recording admitted into evidence and presented to the court was limited to an audio recording of the initial investigation of the perimeter of the defendant's home and the interaction with the defendant.

¶ 7    Turning to the night of the defendant's arrest, Jostes testified that he and Officer Cook were dispatched to the defendant's residence to investigate a domestic violence complaint. A neighbor of the defendant had called 911 and reported hearing a woman screaming and "what sounded like someone being hit or somethin' being thrown." Based upon his professional experience, Jostes generally believed that a third-party caller was a good citizen who was concerned about the well-being of someone else and usually unbiased.

¶ 8    Neither Jostes nor Cook interviewed the 911 caller before investigating the call. Jostes testified that nothing would have prevented the officers from interviewing the 911 caller and seeking a warrant, had the officers believed that there was probable cause to do so. Jostes also testified that the process to get a warrant would typically take between one and four hours. In a 911 domestic call, Jostes's first priority was to make sure everyone was safe, that there were no victims of a crime, and to ensure those in need received medical treatment. Jostes stated that any delay by seeking a warrant would delay medical attention that may be necessary.

¶ 9    According to the recording admitted at trial, Jostes received notification of the domestic violence report at 12:39 a.m. on April 14, 2023. Once Jostes received the report, he and Cook responded to the scene. They parked a block away from the defendant's residence. Both Jostes and Cook were wearing Clinton Police Department uniforms. When the officers reached the defendant's address, Jostes walked around the west side of the residence. Jostes had only been at this residence on one prior occasion. At first, Jostes did not notice anything out of the ordinary. Through a window, Jostes then observed a man inside the house, walking towards the front door.

¶ 10    As Jostes moved toward the front door, he heard a woman screaming but could not determine what she was saying. The screaming described by Jostes was heard by the court in the recording at 12:43 a.m. Jostes testified that when he hears someone yelling that it means someone

3

is "either hurt or being attacked or that someone is in their personal space and they want them to go away."

¶ 11    After hearing the woman screaming, Jostes and Cook approached the front door of an enclosed porch, which led to the residence. Jostes knocked on the door and the defendant answered. The defendant stood in a "bladed" position, with his body at an angle between the door and the house. The door was pulled close to the defendant's body, which prevented the officers from seeing inside the house.

¶ 12    Jostes asked who else was in the residence. The defendant responded more than once that "it doesn't matter, it's his house," and that the officers did not have a right to be there because they did not have a warrant. The defendant also refused to confirm whether there was another person inside the house. Jostes could not see any other people inside the residence as the defendant was preventing the officers from seeing anyone.

¶ 13    During the interaction, the defendant offered to get the woman so she could speak to the officers and tell them that there was no problem. Jostes did not believe that the defendant's offer was genuine. Shortly after the offer, the defendant began to back away from the officers and started to close the front door. Jostes thought that the defendant may lock the door and prevent the officers from investigating the domestic violence complaint and check on the well-being of the woman inside of the house. In response, Jostes and Cook grabbed the defendant's arms. In the process of grabbing the defendant's arm, all three men fell to the ground. After falling to the ground, the officers tried to get the defendant's hands behind his back, and after some difficulty, the defendant was ultimately placed in custody. During the commotion, a woman came to the front door. It was later determined that she had been the woman who was previously screaming.

4

¶ 14     Jostes testified that if the defendant had been successful in locking the officers out of the house, it would have delayed the officers from discovering what had been going on inside of the house. The defendant's actions could have also delayed officers from providing necessary aid to anyone who had been injured. Based on his experience, Jostes testified that if there was a victim of domestic violence inside the home, they could be injured and need medical attention.

¶ 15     Jostes acknowledged, during cross-examination, that there is a difference between someone yelling to get someone's attention versus screaming for help. Jostes testified that the yelling from inside the house was unintelligible.

¶ 16     Officer Patrick Cook testified next for the State. Cook had been a patrol officer for the Clinton Police Department since November of 2021, and had previously worked as a patrol officer in another jurisdiction for approximately eight months. Cook described his training and experience as a police officer. He explained that his training reinforced how dangerous domestic violence calls can be for responding officers. Cook estimated that he had answered 100 to 200 domestic violence calls.

¶ 17     On the night of the defendant's arrest, Cook and Jostes responded to the 911 call. The officers approached the house on foot to observe the area before contacting the occupants. While Jostes walked to the west side of the house, Cook walked to the east side. Cook noticed movement inside the home. Jostes informed Cook that he saw a man approaching the front door and heard a woman yelling. Cook could not hear any yelling. The officers met at the front door. Cook was present during the entire interaction with the defendant and described the defendant as confrontational. The defendant's confrontational behavior increased Cook's concern for what might be occurring inside the residence. Cook testified that anything from a domestic battery to a homicide could have taken place inside the home.

¶ 18    Cook indicated that the interaction with the defendant happened quickly. Jostes had attempted to explain why he and Cook were at the residence and that Jostes had heard a woman yelling. The defendant then offered to get the woman so the officers could speak with her, which Cook believed was a genuine offer. The officers tried to explain that the defendant needed to step outside so the officers could investigate, but the defendant began to retreat inside the house. At that point, the officers stepped into the enclosed porch and detained the defendant because the officers were concerned about the potential victim's safety and their own.

¶ 19    Following Cook's testimony, the State concluded its case. The defendant did not present any evidence and moved for a directed verdict. After considering the arguments from counsel, the circuit court denied the motion for directed verdict. During closing arguments, the State pointed out that the only factual dispute was whether the officers were engaged in performing an authorized act to enter the defendant's home. The State argued that the emergency aid exception or alternatively, that exigent circumstances applied to the warrantless entry of the home to allow officers to discover whether the woman heard yelling was injured. During his closing statement, the defendant argued that the officers did not have exigent circumstances and "jumped the gun and forced entry into the home without a warrant before they could make an adequate determination of what they were dealing with."

¶ 20    Following closing arguments from counsel, the circuit court found that "[t]he officers had a good-faith belief that a domestic violence situation might have occurred and they were trying to investigate that." The circuit court stated that the officers were not obligated to accept the defendant's position where there were exigent circumstances present and that this was the exact type of situation that police officers should be allowed to investigate. The circuit court found that the State proved beyond a reasonable doubt that the defendant committed a material obstruction

6

of the officers' investigation. The defendant was found guilty of resisting or obstructing a peace officer.

¶ 21    In his motion for new trial, the defendant reiterated arguments made in his motion for direct verdict and closing argument. On August 9, 2023, the circuit court held a hearing on the defendant's motion. The defendant argued that the police were not conducting an authorized act because there were not exigent circumstances present to allow the officers' entry into the defendant's home without violating the fourth amendment. The circuit court denied the motion for new trial.

¶ 22    On the same day, the court held a sentencing hearing. The circuit court sentenced the defendant to 12 months of conditional discharge with 100 hours of public service work to be completed in the first 10 months and 1 day in jail with credit for time served. This appeal followed.

¶ 23                                    II. ANALYSIS

¶ 24    On appeal, the defendant argues that no rational trier of fact could have found the defendant guilty of resisting or obstructing a peace officer beyond a reasonable doubt where: (1) the defendant did not materially impede or hinder the officers, and (2) the officers were not engaged in an authorized act within their official capacities.

¶ 25    When a defendant challenges the sufficiency of the evidence at trial, the reviewing court determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Baskerville*, 2012 IL 111056, ¶ 31. To make that determination, we review the evidence in the light most favorable to the prosecution. *Baskerville*, 2012 IL 111056, ¶ 31. All reasonable inferences in favor of the prosecution found in the record will be allowed. *People v. Mehta*, 2020 IL App (3d) 180020, ¶ 14. The trier of fact is not obligated to accept or to search for any "possible explanations consistent with innocence and raise them to

7

a level of reasonable doubt." (Internal quotation marks omitted.) *Mehta*, 2020 IL App (3d) 180020, ¶ 14.

¶ 26 Section 31-1(a) of the Criminal Code of 2012 provides that obstruction of a peace officer is committed where "[a] person *** obstructs the performance by one known to the person to be a peace officer, *** of any authorized act within his or her official capacity." 720 ILCS 5/31-1(a) (West 2022). Further, the defendant's conduct must create "an obstacle that materially 'impedes or hinders the officer in the performance of his authorized duties.' " *Mehta*, 2020 IL App (3d) 180020, ¶ 26 (quoting *Baskerville*, 2012 IL 111056, ¶ 31). If the defendant's conduct threatens an officer's safety or causes an officer to fear for his or her safety, it is a significant impediment to the performance of the officer's duties. *Mehta*, 2020 IL App (3d) 180020, ¶ 31 (quoting *People v. Synnott*, 349 Ill. App. 3d 223, 228 (2004)).

¶ 27 The nature of the obstructive act may be considered as a relevant factor, where the act may increase an officer's safety concerns. *Mehta*, 2020 IL App (3d) 180020, ¶ 34. Also, the nature of the authorized act obstructed is relevant. *Mehta*, 2020 IL App (3d) 180020, ¶ 34. The *Mehta* court explained that an action may not amount to a material obstruction in a misdemeanor stop, but the same action may be a material impediment in a "more fraught situation, such as the hot pursuit of a violent suspect." *Mehta*, 2020 IL App (3d) 180020, ¶ 34.

¶ 28 Here, the record shows that the defendant's refusal to answer the officer's questions and cooperate with the domestic investigation caused a small delay. Nevertheless, both responding officers testified that the defendant's uncooperative behavior occurred during a tense and high-stakes situation for the officers, as domestic disturbances are the most volatile situations that officers may encounter. At 12:39 a.m., the officers responded to a 911 call by a neighbor, who had reported hearing a woman yelling and someone being hit or something being thrown. In

accordance with their training, when officers arrived at the defendant's home, they first looked and listened for anything abnormal. At 12:43 a.m., only a few minutes after receiving the domestic violence report, Jostes heard a woman screaming. The woman's screams indicated to Jostes that "someone's either hurt or being attacked or that someone is in their personal space and they want them to go away."

¶ 29    After Jostes heard the woman screaming, the officers knocked on the front door and initiated contact with the defendant. When the defendant answered the door, he stood between the door and the house in a "bladed" position. Jostes explained that the defendant's body was at an angle with the door pulled close to himself, which was a defensive stance to prevent the officers from seeing inside the house. The defendant was confrontational with the officers and would not answer questions about who else was inside the home. This increased the officers' concern about a potential victim of domestic violence inside the residence who may be injured and in need of medical attention.

¶ 30    During the interaction with the defendant, he eventually offered to go get the woman inside the home so officers could speak with her. The defendant started to back away from the officers and close the front door. Jostes did not believe that the defendant's offer to get the woman was genuine. Jostes thought that the defendant may lock the officers out of the house and prevent them from checking on the potential victim and investigate the domestic violence complaint. Both officers highlighted the safety concern for the potential domestic violence victim if the defendant reentered the house. Both officers also discussed the concern for officer safety because they had only been at the residence once and were not aware whether there were weapons inside the home.

¶ 31    Throughout the course of the officers' investigation, they became aware of circumstances that increased their concern for a potential victim's safety and the officers' safety. "It seems clear

9

that any behavior that actually threatens an officer's safety or even places an officer in fear for his or her safety is a significant impediment to the officer's performance of his or her duties." *Synnott*, 349 Ill. App. 3d at 228. After reviewing the record, we find that a rational trier of fact could find beyond a reasonable doubt that the defendant's conduct created a material impediment to the officers' investigation.

¶ 32 The defendant next argues that the State failed to prove beyond a reasonable doubt that the officers were engaged in an authorized act when they attempted to enter the defendant's home without a warrant. According to the defendant, the officers' entry into the defendant's home was not an authorized act because it was without a warrant and was not justified by probable cause or exigent circumstances.

¶ 33 An "authorized act" is generally any act that an officer is authorized to perform. *People v. Jones*, 2015 IL App (2d) 130387, ¶ 11. However, if an officer's entry into the defendant's home is in violation of the fourth amendment, it is not an "authorized act" even if the entry was part of an official investigation. *Jones*, 2015 IL App (2d) 130387, ¶ 11. The fourth amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. To justify a warrantless entry, there must be both probable cause and exigent circumstances. *People v. Harris*, 104 Ill. App. 3d 833, 842 (1982). The State has the burden to demonstrate exigent circumstances for a warrantless search or arrest. *People v. Foskey*, 136 Ill. 2d 66, 75 (1990).

¶ 34 Probable cause exists when the totality of the facts and circumstances known to the arresting officer at the time of the arrest are sufficient to warrant a man of reasonable caution to believe that an offense has been committed, or is being committed, and that the person arrested has committed the offense. *People v. Santana*, 121 Ill. App. 3d 265, 268 (1984). In reviewing the

10

propriety of a warrantless entry into a private residence based upon exigent circumstances, the guiding principle is reasonableness, and each case must be decided on its own facts. *Foskey*, 136 Ill. 2d at 75-76. When determining whether probable cause exists in a particular case, "the courts deal with probabilities and are not disposed to be unduly technical." *Santana*, 121 Ill. App. 3d at 268-69.

¶ 35 The Illinois Supreme Court set out a nonexhaustive list of factors, which may be considered to determine whether exigent circumstances justify warrantless entry:

> "(1) whether the offense under investigation was recently committed; (2) whether there was any deliberate or unjustifiable delay by the officers during which time a warrant could have been obtained; (3) whether a grave offense is involved, particularly one of violence; (4) whether the suspect was reasonably believed to be armed; (5) whether the police officers were acting upon a clear showing of probable cause; (6) whether there was a likelihood that the suspect would have escaped if not swiftly apprehended; (7) whether there was strong reason to believe that the suspect was on the premises; and (8) whether the police entry, though nonconsensual, was made peaceably." *Foskey*, 136 Ill. 2d at 75.

The factors are not applied rigidly in each case. *People v. Davis*, 398 Ill. App. 3d 940, 948 (2010). Courts will consider the totality of the circumstances that the officers faced at the time of the entry to determine whether there were exigent circumstances and if the officers acted reasonably. *Davis*, 398 Ill. App. 3d at 948. The circumstances present "must militate against delay and justify the officers' decision to proceed without a warrant." *Foskey*, 136 Ill. 2d at 75.

¶ 36 In this case, the defendant claims that there were no exigent circumstances to justify a warrantless entry into his residence. He points out that the trial court considered two cases, *People v. Jones*, 2015 IL App (2d) 130387, and *People v. Santana*, 121 Ill. App. 3d 265 (1984) in determining whether exigent circumstances were present, and he argues that the facts in this case are nearly identical to the facts in *Jones*.

¶ 37 In *Jones*, the police responded to a call by a neighbor, who had heard an argument and the sound of objects breaking. *Jones*, 2015 IL App (2d) 130387, ¶ 3. When officers responded to the

11

call, they saw the defendant and woman arguing in an enclosed porch. *Jones*, 2015 IL App (2d) 130387, ¶ 4. One of the officers opened the door and announced that he was there to investigate a domestic disturbance. *Jones*, 2015 IL App (2d) 130387, ¶ 4. The defendant informed the officer that there was no problem. *Jones*, 2015 IL App (2d) 130387, ¶ 4. The defendant refused requests to step outside and physically resisted officers when they entered and tried to arrest him. *Jones*, 2015 IL App (2d) 130387, ¶¶ 5-8. The *Jones* court did not find exigent circumstances. In its analysis, the court specifically noted that the officer observed that the woman was not visibly injured, and she did not ask for assistance. *Jones*, 2015 IL App (2d) 130387, ¶ 15.

¶ 38    In *Santana*, police responded to a late-night call that reported a domestic disturbance in an apartment, where a woman had been injured and that a weapon might be involved. *Santana*, 121 Ill. App. 3d 265. Officers heard an argument and a dish breaking inside the apartment when they arrived. When the officers approached the apartment door, it appeared damaged by forcible entry. An officer then knocked on the door to investigate the disturbance and the defendant answered. The officers noticed that the defendant was agitated, and he had blood on his hand. Behind the defendant, the officers observed a woman who had blood on her face and blouse. The defendant then slammed the door shut. *Santana*, 121 Ill. App. 3d at 266. At that point, the officers forcibly entered the apartment. The appellate court concluded that the officers had reasonable grounds to believe that a crime was being committed and that the defendant was involved. *Santana*, 121 Ill. App. 3d at 269. The appellate court found that exigent circumstances authorized the officers' warrantless entry. *Santana*, 121 Ill. App. 3d at 268-70.

¶ 39    Contrary to the defendant's contention, the facts presented in this case are closer to those in *Santana*. Here, the officers responded to a 911 call late at night that reported a woman screaming and someone being hit or something being thrown. When the officers arrived on the scene, one of

the officers heard a woman yelling. After hearing the woman yell, the officers knocked on the door and spoke with the defendant. The defendant was uncooperative and confrontational. He would not answer questions and stood in the doorway to prevent officers from seeing inside the home. During the interaction with the officers, the defendant attempted to leave and close the front door. Both officers testified that the defendant's conduct created heightened concerns for their own safety and for the safety of the potential domestic violence victim. As a result, the officers grabbed the defendant by his arms and placed him into custody. Up to that point, the officers were not able to verify whether the potential victim was injured or needed assistance.

¶ 40     Based upon the particular facts and circumstance in this case, we conclude the officers had reasonable grounds to believe a crime had been committed, or was being committed, in the defendant's home and that he was involved in doing so. For the same reasons, we find exigent circumstances existed authorizing the officers to enter the defendant's home. As the officers were permitted to enter the defendant's home without a warrant, a rational trier of fact could have found that Jostes was performing an authorized act within his official capacity.

¶ 41                                  III. CONCLUSION

¶ 42     For the foregoing reasons, we affirm the defendant's conviction.

¶ 43     Affirmed.

13